A. B. HOLLAND, Respondent, v. CHICAGO ROCK
ISLAND & PACIFIC RAILWAY COMPANY,
Appellant.

Kansas City Court of Appeals, December 6, 1909.

1. CARRIERS: Freight: Damages: Notice. Provision in ship-
ping contracts requiring notice of damages to be given the car-
rier will be enforced only when reasonable and where the
circumstances of the particular case justify their strict en-
forcement to protect the carrier against possible fraud or im-
position.

2. ———: ———: ———: ———: Reasonable Time. Where
cattle were placed in a separate pasture and were open to
inspection by defendant during the time that plaintiff's claim
was being investigated, and the extent of the damage could
have been ascertained after notice was given, and where the
full extent of the damage could not be determined within the
time limited for giving notice, plaintiff is not barred from
recovery by a failure to give notice until twenty-seven days
after the delivery of the cattle at destination, although the
shipping contract provided for notice one day after such de-
livery.

3. ———: ———: ———: ———: Requirement for Notice.
The requirement of notice may be invoked as a check against
imposition and not as a sword to defeat an adversary without
regard to the justice of merits of his case.

4. ———: ———: ———: Delay: Negligence. Where proof
of delay will not support an inference of negligence on the
part of the carrier, but very slight evidence of negligence in
addition to such proof, is sufficient for such inference.

5. ———: ———: ———: ———: ———: ———: .
———: ———: ———: ———. Where a carrier accepts
goods for shipment knowing that transportation will be delayed
by shortage of coal or trainmen without notifying the shipper
or stipulating against delays from such causes, it is liable for
damages caused therefrom.

6. ———: ———: ———: ———: ———. Where a delay
of nearly three hours occurred in switching cars of exhausted
and suffering cattle at a station where they were to be un-
loaded and fed, a fair inference of negligence arises.

7. ———: ———: ———: ———: Cause. Where there was
evidence that the cattle were in condition to stand the trans-

Holland v. Railroad.

portation if accomplished in the usual time and manner and that they arrived at their destination in an exhausted and weakened condition, and that seven died *en route* and twenty more died after arrival, the cause of the damage was properly left to the jury under appropriate instructions.

8. ———: ———: ———: **Release: Consideration.** At the time of loading the cattle plaintiff signed a shipping contract reciting that the tariff rate, which was charged plaintiff, was less than the rate imposed at shipper's risk, and containing a stipulation releasing defendant from any damages that had accrued to him by any written or verbal contract prior thereto. *Held* that the recital in the shipping contract that the tariff rate, charged plaintiff, was a reduced rate was, in the absence of contrary proof, conclusive; and constituted a sufficient consideration for the release of prior claims for damages.

### On Rehearing.

9. ———: ———: **Shipping Contracts: Rates.** The "tariff" rate is the highest rate a carrier can charge and a recital in the shipping contract that the "tariff" rate was charged will control over a recital that the rate was "less than the rate charged for shipments transported at carrier's risk." [Following George v. Railroad, 214 Mo. 55.]

10. ———: ———: ———: **Hepburn Act.** Under the express provisions of the Amendment to the Interstate Commerce Act known as the Hepburn Bill, which went into effect August 28, 1906, no contract the carrier may make with the shipper, for interstate transportation of freight, whether supported by consideration or not, shall have the effect of releasing any part of the carrier's common law liability.

11. ———: ———: **Damages: Release.** A shipper claimed that cattle were damaged while in the yards waiting for cars which the carrier had failed to furnish on the date promised; upon the arrival of the cars and the loading of the cattle the shipper signed a shipping contract reciting that the rate charged was the "tariff" rate, that the rate was less than the rate charged for transportation at carrier's risk and containing a stipulation releasing the carrier from all prior claims for damages; the shipment was interstate. *Held*, that the stipulation for release of damages was void because without consideration and also as being in contravention of the express provisions of the Hepburn Bill.

Appeal from the Jackson Circuit Court.—*Hon. James H. Slover*, Judge.

AFFIRMED.

*M. A. Low* and *Sebree, Conrad & Wendorff* for appellant.

(1) The court erred in refusing to give the instruction in the nature of a demurrer to the evidence at the close of all the evidence. First. Because the notice of damage was not given. Letts v. Wabash, 111 S. W. (Mo. App.) 138; Smith v. Railway, 112 Mo. App. 610; Shelton v. Railway, 110 S. W. (Mo. App.) 627; Freeman v. Railroad, 118 Mo. App. 526; Meriwether v. Railroad, 128 Mo. App. 665. Second. No negligence was proven. Fountain v. Wabash, 114 Mo. App. 676; Meriwether v. Railroad, 128 Mo. App. 663; Helm v. Railway, 98 Mo. App. 423; McFadden v. Railway, 92 Mo. 349; Powder Mfg. Co. v. Railroad, 196 Mo. 669; Shelton v. Railway, supra; Haincock v. Railroad, 111 S. W. (Mo. App.) 519; Wynck v. Railway, 120 Mo. App. 299; Elliott on Railroads, sec. 1484; Ingwerson v. Railroad, 116 Mo. App. 151; Bushnell v. Railroad, 118 Mo. App. 626; Ecton v. Railroad, 125 Mo. App. 225. (2) The court erred in refusing to give instruction number 3 asked by appellant. (See authorities under point 1.) The verdict was excessive, not founded upon the evidence, and the result of passion and prejudice.

*Samuel W. Sawyer* and *Lathrop, Morrow, Fox & Moore* for respondent.

(1) It may well be said in this case that the freight claim agent's letter, stating that he was still investigating the claim and was getting the information as quickly as possible and would advise as soon as the opportunity presented itself regarding disposition, and stating that he could only ask further indulgence, was a waiver of the giving of any notice required by paragraph 7 by an official of the defendant having authority so to do. Hutchinson on Carriers. (3 Ed.), sec. 444, states the law to be that if a carrier treat the claim as pending, notice is waived. (2) This law, declared by the Supreme Court as well as by this court,

applied to the facts in this case, shows clearly that plaintiff is entitled to recover from defendant the amount of the judgment in this case. Hutchinson on Carriers, (3 Ed.), states the same rule in section 443, as follows: The owner, however, will not be precluded from the right to recover for a loss or injury where to require him to present a notice of his claim within a specified time, would be unreasonable. In support of this, Missouri authorities are cited and it is there stated that ordinarily this is a question of fact for the jury. This issue was submitted to the jury in this case and found by them in favor of plaintiff. While mere delay without substantial evidence of negligence is not sufficient to warrant recovery of damages, under the authorities it is held that any and even slight additional evidence takes the case to the jury, and the whole conduct of the carrier from the giving of the order to drive the cattle in for shipment until delivery at the unloading chute is for the triers of fact. Anderson v. Railway, 93 Mo. App. 677; Wright v. Railroad, 118 Mo. App. 392; Ecton v. Railroad, 125 Mo. App. 223; Ficklin v. Railroad, 117 Mo. App. 211; Griffin v. Railroad, 115 Mo. App. 549; Fulbright v. Railroad, 118 Mo. App. 482; Ratliff Brothers v. Railroad, 118 Mo. App. 644; Gilbert v. Railroad, 112 S. W. 1002. Even outside of the doctrine of *res gestae* such declarations would be admissible as admissions of defendant's agent in the course of his duty. Adams v. Railroad, 74 Mo. 556; Pitts v. Steele Co., 55 Mo. App. 221; Dillon v. Railway, 71 Mo. App. 626; Meagher v. Railway, 15 Mo. App. 501; Hampton v. Pullman Co., 42 Mo. App. 134; Meade v. Railway, 68 Mo. App. 92.

JOHNSON, J.—Action by a shipper of live stock against a common carrier to recover damages for delays resulting from the negligence of the carrier in receiving, unloading and transporting a shipment of 1121

head of cattle. Verdict and judgment were for plaintiff and the cause is here on the appeal of defendant. The cattle were shipped on May 2, 1907, from Texhoma, Oklahoma, to Hutchinson, Kansas, there to be delivered to the Atchison, Topeka and Santa Fe Railway Company, a connecting carrier, for further transportation to Clements, Kansas, near which place they were to be pastured during the summer.

It is alleged in the petition "that about April 10, 1907, defendant agreed with plaintiff to receive said cattle from plaintiff at said Texhoma, Oklahoma, on April 25, 1907, for said shipment, and to ship same in a reasonably safe and careful manner, and without unnecessary and unreasonable delay; that plaintiff relied upon said agreement and acted upon it, but that; notwithstanding said agreement, defendant carelessly and negligently failed to receive said cattle upon its cars at the said time agreed upon, and carelessly and negligently caused, and permitted such failure to receive said shipment of cattle to continue until 11:30 a. m., May 2, 1907; that by reason of the fact that plaintiff relied upon the said agreement his said cattle had been brought to the loading yards, and by reason of the failure of defendant to keep its said agreement, there was occasioned serious damage to said cattle by reason of having them held in and about said yards until defendant would receive same on board its cars . . . that said defendant still further carelessly and negligently failed to carry out its agreements with plaintiff and failed entirely to carry the said shipment in a reasonably safe and careful and expeditious manner in that defendant caused and permitted numerous long delays in the course of said shipment, and caused and permitted its said trains in and by which it was attempting to transport said live stock to be operated at an unreasonably slow rate of speed and with numerous unnecessary and unreasonable stops and delays, and that all of said delays, both those prior to shipment and those during the

course of the shipment, and including those in the unreasonable slowness of the speed as well as those which consisted in unnecessary and unreasonable stops and delays, were contrary to the repeated requests of this plaintiff and against his repeated protests . . . that the said delays resulted in the transportation of said cattle during a severe, cold, drenching and chilling storm, which would have been averted in a large part at least, had said shipment been made without unnecessary delays, and that defendant was still further careless and negligent in causing and permitting the said cattle to stand still and without protection for long periods of time during the continuance of said storm in violation of its duty as a common carrier and against the request and in spite of the protests and objections thereto of this plaintiff . . . that by reason of all the premises, the said carelessness and negligence of the defendant resulted in causing the death of twenty-four of the said cattle, and in causing the serious injury and damage to all of the remainder of said cattle," etc.

The defenses pleaded in the answer are, first, a general denial; second, that by the terms of a written contract executed by the parties on May 2, 1907, plaintiff, for a valuable consideration, "released and waived any and all cause for action for damages against the defendant, if any there were, which may have accrued to him by any written or verbal contract prior to the execution of said last-mentioned contracts, and said shipment was made under said written contracts," and third, that plaintiff failed to give defendant written notice of his damage in accordance with the stipulation in said written contracts which required the giving of such notice "within one day after the delivery of the stock at its destination." A waiver of the notice is pleaded in the reply.

Defendant argues that the court erred in refusing its request for an instruction to the jury peremptorily

directing a verdict in its favor. The evidence adduced by plaintiff discloses the following state of facts:

During the winter and spring preceding the shipment, plaintiff pastured the cattle on his ranch near Texhoma. They had been given no other food than that which they obtained from grazing but were in good flesh and condition. The herd shipped consisted entirely of steers, twenty-one head being two years old, forty-two head three years and the remainder four years old. Plaintiff desired to pasture them during the summer near Clements, Kansas. To remove them to that place, it was necessary to ship them over defendant's railroad from Texhoma to Hutchinson, Kansas, a distance of 249 miles, and from Hutchinson to Clements— seventy miles—over the Santa Fe road. To effectuate this purpose, plaintiff, on April 5, 1907, ordered of defendant forty stock cars of specified dimensions which defendant orally agreed to have at Texhoma on April 25th. The cars did not arrive on that date and plaintiff, after much exertion, obtained the promise that they would be at Texhoma on May 1st. Pursuant to this arrangement, plaintiff had the cattle driven to Texhoma in time for them to be "dipped" on the 27th and 28th of April. Believing the animals had been exposed to "scabies" the official inspector required them to be dipped before shipment into another State. In the process, the animals were immersed in a solution heated almost to the scalding point. The weather was warm and pleasant and plaintiff says the treatment did not affect their health or vitality, while defendant contends that it irritated, excited, chilled and weakened them. Plaintiff and the agent of defendant agreed that the loading in the cars should begin at six o'clock in the morning of May 2nd. Accordingly, plaintiff had the cattle placed in the railroad pens late in the afternoon of the preceding day. From that time until unloaded at Hutchinson, they went without food or water. Plaintiff had his employees "on the fences" at five o'clock in the

morning of the 2nd, ready to drive the cattle to the load-
ing chute, but defendant did not back up the train and
begin loading until 11:30 that morning.    Defendant
did not have its loading gang on hand but pressed into
that service section men and other employees.    There
were many delays and interruptions and the loading
was not completed until five o'clock in the afternoon.
Had it been conducted in the usual and proper way,
it should not have required more than five minutes to
load each car.    The delay is accounted for by the con-
gested condition of defendant's business and yards at
that point, and the fact that its switch engines and em-
ployees were used in switching "dead freight" when
they should have been employed in loading the cattle.
The train did not leave Texhoma until 7:30 o'clock
that evening.    Shortly before it left, the parties execu-
ted written contracts of affreightment—four in number.
The train reached Tyrone, 53 miles from Texhoma, at
11 o'clock that night.    On the way, a severe storm arose,
first rain, then snow and sleet, accompanied by a
stiff, cold wind from the north.    There was a delay of
four hours at Tyrone, waiting for coal.    The conductor
stated to plaintiff that defendant was out of coal at
that place on account of the coal famine then prevail-
ing.    Finally coal was obtained from two smaller en-
gines and the train proceeded.    It reached Liberal, a
distance of nine miles, at 3:25 a. m. and stayed there
two hours.    On the way from Texhoma the conductor
complained to plaintiff that he and his crew had been
on duty for twenty-four hours and were "nearly all in"
but assured plaintiff that "it isn't considered good eti-
quette for a train crew to lay down on a stock train
and we are not going to do it."    As the train approached
Liberal, the conductor told plaintiff that when it reached
that place "we are going to report in for rest."    When
the train left Liberal two hours later, it had a new crew.
The next stop of consequence was Bucklin, eighty or
eighty-five miles further on.    The arrival there was at

11:25 in the morning of the 3rd, and the train did not leave until 1:45 in the afternoon. Plaintiff saw the trainmaster of defendant there and informed him that the cattle were in a very weakened condition. The trainmaster assured plaintiff that he would make arrangements "to have a train crew ready to haul you out of Hutchinson when you get there," and asked plaintiff to sign a release of damages. Plaintiff refused. The train reached Hutchinson at 7:30 that evening, and it was decided to unload and feed the cattle, but for some inexplicable reason, the cars were not taken to the stock yards until 10:15 p. m. and unloading was not completed until 1:25 in the morning of the 4th. Three cattle were dead in the cars, two died in unloading and two more died that night. The entire herd was badly used up and was so weak that many of the animals staggered. After being fed and watered, they were re-loaded and the train left for Clements at 4 o'clock in the afternoon, making the run in the usual time. At Clements, they were unloaded and taken to the pasture. They were still very weak and twenty more died. The agent of the Santa Fe company at Clements requested plaintiff to sign a receipt for the cattle which contained the statement that they were in good order, but plaintiff refused and erased the words before signing the receipt. After the cattle were placed in the pasture, plaintiff went to Kansas City and employed lawyers to collect his damages.

On May 31st, they wrote defendant's claim agent that plaintiff claimed he had been damaged in the sum of $3,285.25, on account of the delays we have enumerated. This was the first written notice given defendant of the claim, but during the transportation, plaintiff orally called the attention of the agents of defendant to the fact that the cattle were damaged. July 15th, defendant's claim agent wrote plaintiff's attorneys: "In reference to your tracer of July 1st, in regard to claim of A. B. Holland of Wilkins, O. T., amounting to $3,-

285.25, I beg to advise that I am still investigating this claim. You certainly understand that a claim of this size needs considerably more investigation than a smaller one, but on the contrary, I am getting the information as quickly as possible and will advise you as soon as the opportunity presents itself regarding disposition. I can only ask for your further indulgence." After the cattle were placed in the pasture near Clements, they were not mingled with other cattle and were open to inspection during the period occupied by defendant in investigating the claim.

Defendant introduced in evidence the written contracts of affreightment. They contained the recitation "cars said to contain cattle, head of——from Texhoma station to Hutchinson station, consigned to A. B. Holland at the rate of t. f. (tariff) per car from Texhoma to Clements subject to minimum weights and length of cars specified and provided for in tariff, said rate being less than rate charged for shipments transported at carrier's risk, for which reduced rates and other considerations, it is mutually agreed between the parties hereto," etc. Among the stipulations is the following:

"That as a condition precedent to claiming or recovering damages for any loss or injury to or detention of live stock or delay in transportation thereof, covered by this contract, the second party as soon as he discovers such loss or injury, shall promptly give notice thereof in writing to some general officer, claim agent or station agent of the first party, or to some agent at destination, or to some general officer of the delivering line, before such stock is removed from the point of shipment or from the place of destination, as the case may be, and before such stock is mingled with other stock; and such written notice shall in any event be served within one day after delivery of the stock at its destination, in order that such claim may be fully and fairly investigated. It is agreed that a failure to strictly comply with all the foregoing provisions shall be a bar to the recovery

of any and all such claims." Further, it was stipulated: "That the second party hereby releases and waives any and all cause for action for damages that may have accrued to him by any written or verbal contract prior to the execution hereof."

Defendant argues that the demurrer to the evidence should have been sustained on the ground that since the written notice of the claim was not given defendant until more than three weeks after the shipment reached its destination and was unloaded, the claim is barred under a stipulation of the contract above quoted. The answer of plaintiff is, first, that notice was given in a reasonable time, under all the circumstances of the case and, second, that performance of the stipulation was waived by defendant.

For the purpose of the questions arising from this contention, we shall assume that the stipulation was supported by a sufficient consideration, viz., a reduced rate. Putting aside the question of waiver, we think the notice was given in proper time. Provisions in shipping contracts for the giving by the shipper or consignee to the carrier of notice of claim for damages on account of negligence in the transportation are strictly enforced only when they are reasonable and where the circumstances of the particular case justify their strict enforcement as a means to protect the carrier against possible fraud or imposition. Had these cattle been shipped to market for the purpose of slaughter, or had they been mingled with other cattle in the pasture at Clements, in a manner to make their identification impossible or difficult and uncertain, there would be much force in the argument that defendant could not thus be deprived of the opportunity to investigate the nature and extent of the damage when the parties had expressly contracted that such opportunity would be afforded, but with the cattle kept apart from other cattle and open to inspection, defendant, under the notice given, had the very opportunity to investigate that

the contract was designed to afford. It is not seriously contended here, nor was it contended by the claim agent of defendant that an inspection of the cattle after the reception of the notice would not have disclosed the nature and extent of the damage. And, too, there is much force in the argument of plaintiff that as the cattle were to be pastured, he could not know the extent of the damage within the time for giving notice fixed by the contract. Until the effect of rest and food on the cattle had been observed, the full extent of the injury could not be known. As was said by the Supreme Court in Rice v. Railway, 63 Mo. 314: "While . . . such special agreements are valid and binding when they are reasonable, they should be reasonably and justly construed in their application to each case as it arises." The circumstances before us place defendant in the position of invoking the stipulation, not as a shield to guard it against possible imposition, but as a sword with which to defeat its adversary without regard to the merits or justice of his cause. Such position is untenable. [Rice v. Railway, supra; Freeman & Hinsen v. Railway, 118 Mo. App. 526; Popham v. Barnard, 77 Mo. App. 619; Ward v. Railway, 158 Mo. 226.]

Further, defendant argues that even in its aspect most favorable to plaintiff, the evidence does not disclose any negligence in the transportation on the part of defendant. The evidence of plaintiff tends to show the existence of an excess of about sixteen hours over the time ordinarily consumed in the transportation of cattle from Texhoma to Hutchinson. It has been held repeatedly that mere proof of delay, of itself, will not support an inference of negligence on the part of the carrier, but it also has been held that the addition to such proof of very slight evidence of negligence on the part of the carrier will suffice to raise the inference that the delay was negligent.

The delay of four hours at Tyrone, which appears to have been caused by the engine being out of coal, cannot be regarded otherwise than as negligent. Defendant endeavors to excuse the exhaustion of its supply of coal at that place by the fact that a coal famine existed which disabled it from procuring necessary supplies, but such excuse cannot be entertained. The condition, if it existed, must have been known to defendant when it received the shipment at Texhoma, and in contracting with plaintiff for the transportation of his cattle without stipulating against delays from this cause, or even notifying him that such delays might be encountered, defendant, in effect, assumed the risk that might arise from them. The rule thus is stated by us in Russell Grain Co. v. Railway, 114 Mo. App. 488: "When, at the time the shipper offers freight to the carrier, conditions exist that will prevent the delivery within a reasonable time (which means the time usually consumed under ordinary circumstances), different principles control. The carrier is not expected to perform the impossible, and may refuse to accept freight unless the shipper will agree to suffer delay in delivery made necessary by the extraordinary conditions. But the acceptance of goods for shipment without such stipulation, or without notifying the shipper of the fact that they cannot be promptly delivered, is tantamount to an assurance that they will be delivered within a reasonable time, except for the intervening of excusing causes of subsequent occurrence."

What we have just said applies to the delay at Liberal which appears to have been caused largely by the failure of defendant to provide enough train crews to care for its business properly. While it is shown that the business of defendant was heavy, it is not shown that it was extraordinarily large for that season. But had it been true that defendant was burdened with a sudden and extraordinary influx of business, that would not have excused the delay since the condition existed

when the shipment began and defendant did not stipulate for immunity from liability on account of it. For the reasons stated in Gilbert v. Railway, 112 S. W. 1002, — Mo. App. —, recently decided by this court, a fair inference arises that the delay of approximately three hours in switching the cars of exhausted and suffering animals to the stockyards at Hutchinson was negligent. All of the circumstances to which we have referred are sufficient to satisfy the rule that "it is enough for plaintiff to disclose circumstances sufficient to raise an inference of negligence and especially is this so where the means of showing how the delay occurred is with the defendant and not the plaintiff." [Bushnell v. Railroad, 118 Mo. App. 618, and cases cited.]

But it is insisted that these delays do not appear as the proximate cause of the injury; that having had no food but grass during the winter and spring and being further enervated and weakened by the dipping process the cattle were not in condition to stand the journey and the loss resulted from natural weakness, not from delays. The evidence of plaintiff tend to show that the cattle were in condition to stand the transportation had it been accomplished in the usual time and manner. Therefore, we deem the issue of whether or not the injury was the direct result of the delay to be one of fact which we find was submitted to the jury in proper instructions, and we find no occasion to interfere with the finding of the jury on that issue. The demurrer to the evidence was properly overruled.

On the question of the measure of damages, it is the theory of plaintiff, adopted by the trial court in the instructions, that the recoverable damages include those resulting from the negligent delays that occurred after the stock was put in the railroad pens and before the transportation began as well as those which occurred after the beginning of the transportation, while defendant argues that the written contracts exempt it

from liability for all acts preceding their execution which was practically contemporaneous with the beginning of the transportation. The question was squarely decided by this court adversely to the position of plaintiff in Hoover v. Railway, 113 Mo. App. 688. It is true that when live stock is placed in the carrier's pens prepared for shipment, the relation of shipper and carrier begins at the time the carrier's agent receives notice that the stock is in the pens. [Mason v. Railway, 25 Mo. App. 473; Lachland v. Railway, 101 Mo. App. 420.] But equally is it true that the shipper in the written contract of affreightment subsequently executed may release the carrier from damages resulting from its negligent delay in providing cars or loading the stock. In the contracts before us, it is expressly provided that plaintiff "hereby releases and waives any and all cause for action for damages that may have accrued to him by any written or verbal contract prior to the execution hereof." Obviously, this provision was intended to apply to damages sustained after as well as before the relation of carrier and shipper began, i. e. to include all existing demands. The rule thus is stated by ELLISON, J., in the Hoover case:

"If damages have accrued under a verbal contract and there is no waiver or disclaimer of such breach in the subsequent writing, an action may be maintained on the verbal agreement, notwithstanding there was a subsequent writing. But if the subsequent agreement contains among its stipulations that any breach of the verbal contract relating to the shipments is waived, thereby evincing an intention on the part of the contracting parties to regard the writing as covering the whole shipment and determining their rights arising by reason of such shipment, no action can be maintained on the verbal agreement. [Harrison v. Railway, 74 Mo. 364; Railway v. Cleary, 77 Mo. 634; Miller v. Railway, 62 Mo. App. 252, 259.]"

But plaintiff, in his argument here, attacks the

stipulation on the ground that it is not supported by a sufficient consideration. The contracts recite that the tariff rate (the one charged plaintiff) on cattle shipped under contract which exempts the carrier from the full burden of its common law duties is less than that imposed where the shipment is made "at carrier's risk." This is a reduced rate within the meaning placed on the term by the courts, is one which the carrier might offer its patrons under the interstate law, and affords an adequate consideration for the stipulation. Plaintiff did not attempt to prove that the rate charged him was not, in fact, a reduced rate, and in the absence of such proof, we must accept the recitation of the contract as conclusive. The instruction should not have allowed the recovery of damages sustained prior to the execution of the contracts.

We find no other error in the record, but for that just discussed, the judgment is reversed and the cause remanded.

All concur.

## ON REHEARING.

In his motion for a rehearing, plaintiff attacked the soundness of our declaration in the concluding paragraph of the foregoing opinion that the written contract was supported by the consideration of a reduced rate and, consequently, that plaintiff had expressly released defendant from liability on account of its breach of the prior oral contract. Our attention was called by this motion to the case of George v. Railroad, 214 Mo. 551, decided by the Supreme Court in November, 1908, and later, counsel brought to our notice the provisions of the amendment to the Interstate Commerce Act, which went into effect August 28, 1906 (commonly called the Hepburn Bill). We sustained the motion for a rehearing and since then, counsel have reargued the case and have filed briefs in which the following questions are exhaustively discussed:

First.   Do the recitations of the written contract disclose a consideration in the shape of a reduced rate and, second, with respect to interstate shipments, may a common carrier reduce its common law liability by contract supported by a consideration?

The only evidence in the record dealing with the questions which we shall make the subject of this supplemental opinion is the written contract introduced by defendant.   We thought the recitation that the rate charged (though referred to as the tariff rate) was less than the rate that would be charged for a shipment under a non-release contract, constituted *prima facie* evidence that the contract was supported by the consideration of a reduced rate and in the absence of evidence to the contrary, became conclusive.

In this conclusion, we were abundantly sustained by other decisions of courts of last resort in this State. In Wyrick v. Railroad, 74 Mo. App. l. c. 414, we said, speaking through SMITH, P. J.: "The recitals of the contract *prima facie* established that the plaintiff shipped his animals in consideration of a special or reduced rate.   And since these recitals are not contradicted or overthrown by any evidence in the case they must be deemed conclusive."   Speaking of that case, we said recently in Myers v. Railway, 120 Mo. App. 288: "But in that case the written contract of affreightment expressly recited a reduced rate as the consideration given for the release agreement and we held that such recital was *prima facie* evidence of the truth thereof and cast the burden of proof on the shipper," etc.

In Manufacturing Co. v. Railroad, 196 Mo. l. c. 669, the Supreme Court cited the Wyrick case, and in Wabash v. Sloop, 200 Mo. 198, the same court say: "But the real question in the Wyrick case was that the shipper had signed a written contract in which it was recited that the company had two rates upon live stock and that the rate given was a special rate and under-

stood to be less than the published tariff rate. That by reason of having signed this contract without fraud, deceit, imposition or mistake, he was bound by the statements therein and that these recitals were *prima facie* evidence and established the fact of a reduced rate as consideration for the contract." The soundness of this proposition was not questioned by the Supreme Court in that opinion.

And further, we thought the employment of the word "tariff" to designate the rate charged did not militate against the recital that it was a reduced rate. Tariff rate can mean nothing but a regular schedule rate as distinguished from a special rate. That common carriers may have two schedule rates applicable to shipments of a given class of property would seem to be consistent. Certainly it is compatible to have one rate for shipments under a non-release contract and a lower rate for those under a released contract and in such case, the latter rate as compared to the former would be a reduced rate. But in this last conclusion, we find ourselves to be at variance with the decision of the Supreme Court in George v. Railroad, supra. In that case the defendant was the same as the present defendant and we infer the contract was substantially the same as that now under consideration. The court held that the word *tariff* referred to the highest rate the defendant could charge and, consequently, that the subsequent recitals to the effect that it was a reduced rate, however strong, were inconsistent with the statement that the tariff rate had been exacted and on that account should be rejected. We quote from the opinion:

"The contract which defendant produced in evidence in this case recited that the price charged for the transportation was "at the rate of —— tariff —— per cwt." A shipping contract in exactly the same words in this respect was construed by this court in Kellerman v. Railroad, 136 Mo. 177, to mean that the

price charged was the full tariff rate. The statute (sec. 1136, R. S. 1899) requires the railroad company to print and keep posted in their stations a schedule of freight rates and it is forbidden to charge shippers more than those rates. The highest rate that this defendant could have charged the plaintiffs for that shipment was the tariff rate, and that rate covered all that the carrier could demand for the performance of all its common law or statute duty in respect of that shipment. Therefore, when the contract shows that that was the rate charged it was vain to recite therein that it was 'less than the rate charged for shipments transported at carrier's risk.' The plaintiff is not here contending that the carrier assumed anything more in the way of a risk than that embraced in the duty which the law imposes upon a railroad company in the transportation of live stock carried at the regular tariff rate."

We are constrained to place the same interpretation on the contract before us, and accordingly must hold that the term "tariff" refers to the rate charged for shipments under a non-release contract and that controlling effect must be accorded this declaration that the highest rate was charged.

But, defendant argues that a vital distinction exists between the case at bar and the George case. It is pointed out that the Supreme Court was dealing with an intrastate shipment, while we have before us an interstate shipment, and it is argued that interstate shipments are governed entirely by the provisions of the Interstate Commerce Act and that we must follow the decisions of the Federal Courts in our construction of that Act and of contracts relating to interstate shipments. That may be true, but in attempting to escape the doctrine of the George case by seeking refuge in the Federal sanctuary, defendant but jumps from the frying pan into the fire. We concede the ruling of the Supreme Court of the United States in Cau v. Railway, 194 U. S. 428, and in Arthur v. Railroad, 204 U. S.

505, cannot be harmonized with what was said by our Supreme Court in the George case. In the Cau case, it was said:

"It is again urged that there was no independent consideration for the exemption expressed in the bill of lading. This point was made in York Co. v. Central Railroad, supra. In response it was said: 'The second position is answered by the fact that there is no evidence that a consideration was not given for the stipulation. The company, probably, had rates of charges proportioned to the risks they assumed from the nature of the goods carried, and the exception of losses by fire must necessarily have affected the compensation demanded. Be this as it may, the consideration expressed was sufficient to support the entire contract made.' In other words, the consideration expressed in the bill of lading was sufficient to support its stipulations. This effect is not averted by showing that the defendant had only one rate. It was the rate also of all other roads, and presumably it was adopted and offered to shippers in view of the limitation of the common law liability of the roads."

But neither this case nor the Arthur case is in point, for the reason that they deal with the Interstate Commerce Act as it stood before the Hepburn amendment, while the shipment in the present case occurred after that amendment went into effect. That amendment contains the following pertinent provisions:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury, to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass, and

no contract, receipt, rule, or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: *Provided,* that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage, or injury, shall have been sustained, the amount of such loss, damage or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

So far as we are advised that amendment has not been construed by the Federal courts. In Smeltzer v. Railroad, 158 Fed. Rep. 1. c. 666, Judge Rogers said: "The evident purpose of Congress in the enactment of the statute under consideration was to enable the shipper to have recourse to the receiving carrier and leave it to its recourse upon the particular company which inflicted the injury."

But in that observation, the learned judge did not deal with the question of whether the amendment deprived common carriers of the right to enter into "released" contracts with their shippers. The language of the Amendment is susceptible of no other reasonable interpretation than that Congress intended to give a shipper of an interstate shipment recourse against the receiving shipper for any loss, damage or injury to the property *caused* by such carrier or any connecting carrier. The scope of the word "caused" as thus employed is coextensive with the full measure of a carrier's liability at common law. And it is expressly provided that no contract the carrier may make with the shipper, whether or not it be supported by a consideration shall have the effect of releasing any part of the carrier's common law liability. Such, evidently, was the con-

clusion of Judge GOODE in Blackmer v. Railroad, 119 S. W. 1; — Mo. App. —: "We observe that if a receipt is construed to be a through contract, it is so for the purpose of extending the initial carrier's liability as an insurer as well as for negligence; and as the Interstate Commerce Act appears to forbid any limitation of a carrier's liability as insurer when it contracts to carry through (section 20, Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. 386 (U. S. Comp. St. 1901, p. 3169), as amended by Act of June 29, 1906, c. 3591, sec. 7, 34 Stat. 593 (U. S. Comp. St. Supp. 1907, p. 906), this onerous obligation must attach to interstate shipments out of Missouri, unless the bill of lading is so drawn as to satisfy the courts it is for local carriage only."

We conclude that from whatever angle it is viewed the written contract before us must be held void, its contractual stipulations ignored, and defendant held to the common law liability that would have obtained had no written contract been executed. In this view, we recede from that part of our decision in the foregoing opinion which holds that the instruction on the measure of damages was erroneous. It follows that the judgment must be affirmed. It is so ordered.

All concur.