JERRE McELVAIN, Respondent, v. ST. LOUIS &
SAN FRANCISCO RAILROAD COMPANY, Appellant.

Springfield Court of Appeals, November 10, 1910.

1. **PRINCIPAL AND AGENT: Common Carriers: Agent's Authority to Sign Shipping Contract.** When goods are put in charge of an agent to deliver to a carrier for shipment, he is presumed to have authority to make the necessary contract at the point of shipment, and such authority includes all the necessary and usual means for carrying the contract into effect, and includes also the authority to sign the usual contract releasing the carrier from its common law liability.

2. ———: ———: **Knowledge of Agent.** Where an agent with authority so to do, signs a shipping contract, one of the provisions of which calls for a written notice to the carrier of any damage to the shipment, to be given within one day after the shipment arrived at its destination, the shipper was bound by the provisions although he may have had no actual knowledge thereof, as in such cases the principal would be charged with implied knowledge of the existence of such facts concerning the contract and its provisions, as are within the knowledge of the agent.

3. **COMMON CARRIERS: Shipping Contract: Provision as to Notice of Damages.** The provision in a shipping contract requiring written notice of damages to be given to the carrier has been uniformly upheld by the courts, when the provision is reasonable and supported by a valuable consideration. The provision was held reasonable and binding where the contract covering a shipment of mules called for notice within one day after the delivery of the mules at destination, and before they were mingled with other stock, and it appeared that the notice could have been readily and conveniently given to the station agent at the place of destination.

4. ———: ———: **Limiting Common Law Liability: Consideration: Reduced Freight Rate.** It is essential to the validity of a contract of affreightment limiting the carrier's common law liability, that a sufficient consideration, independent of that of the transportation, be shown. A reduced freight rate is a proper consideration.

5. ———: ———: **Fraud.** A contract of affreightment limiting the common law liability of the carrier to be binding upon the shipper must be based on a consideration, be reasonable in its

provisions, and the assent of the shipper must be obtained without fraud or imposition.

6. ————: ————: ————:  **Provision as to Notice of Damages.** The provision in a live stock shipping contract, requiring written notice of injury to the stock and claims for damages to be given to the carrier, is, under the rule announced by the Supreme Court, a limit upon the carrier's common law liability, and is not binding unless supported by a consideration other than the transportation itself.

7. ————: ————:  **Reduced Rate: Recitals in Contract: Evidence.** The recital in a live stock shipping contract that the carrier has two rates on live stock, and that the shipper has availed himself of the lower and reduced rate, is prima facie evidence of that fact, and when nothing to the contrary appears is sufficient to show that the shipment was made at the reduced rate, although the specific rate in dollars and cents is not given.

8. **EVIDENCE: Common Carriers: Shipping Contract: Reduced Rate: Prima Facie Case.** The evidence which plaintiff claims establishes that defendant carrier had only one freight rate on live stock is examined and *held* not to overcome the prima facie case established by the recitals in the contract that the carrier had two rates, and that plaintiff had availed himself of the reduced rate.

9. **CONTRACTS: Construction: Consideration: Common Carriers.** A live stock shipping contract, although on one sheet, consisted of an offer by the shipper of the stock for shipment at a released valuation in order to get the reduced rate. This offer was accepted and this portion of the contract was signed by both shipper and carrier. The other portion was headed, "Live Stock Contract" and contained other provisions and limitations on the carrier's common law liability, based on a reduced rate as a consideration. *Held*, this was but one transaction constituting one contract and based upon one consideration, namely, the reduced rate.

10. **INTERSTATE COMMERCE: Hepburn Act: Federal Question: Common Carriers: Contracts: Construction.** The construction of the Hepburn Act and the scope of its operation is a Federal question and as to such question the state courts will follow and are bound by the decisions of the Federal Courts. But contracts for reduced rates, not being affected by such law, no Federal question arises and no Federal right is involved, and hence the state courts are free to apply their own rules to its construction.

McElvain v. Railroad.

11. ———: **Common Carriers.** The Interstate Commerce Act is a part of the law of this state and enforcible in its courts when rights under it or given by it arise as incidents of the trial, and an interstate common carrier is free to exercise all its rights under the common law to the full extent, unless such exercise has been made unlawful by the Act.

12. ———: **Hepburn Act: Limiting Right to Contract.** There is but one liability which can properly be said to be imposed by the Hepburn Act, (Carmack Amendment) and that is the liability of the initial carrier for a loss occurring on the line of the connecting carrier; and the statute forbids the making of any contract, receipt or regulation exempting the initial carrier from the liability imposed by this statute; but the Act does not change or affect the right or liability of the carrier as to shipments and losses on its own line, so it does not limit the contract between shipper and carrier for a reduced rate, nor for a reduced valuation of the property shipped. (This cause was certified to the Supreme Court, because the opinion on this proposition is in conflict with the St. Louis and Kansas City Courts of Appeal.)

Appeal from Pemiscot Circuit Court.—*Hon. Henry C. Riley,* Judge.

REVERSED AND REMANDED *(and certified to the Supreme Court.)*

*W. F. Evans* and *Moses Whybark* for appellant.

(1) The court erred in refusing instruction No. 5 asked for by defendant. That instruction under the evidence is the law. The plaintiff executed the contract pleaded and offered in evidence in consideration of a reduced rate, which was shown both by the contract and the evidence adduced at the trial. He gave no notice and he was barred by his contract from recovering. Shelton v. Railroad, 131 Mo. App. 560; Ward v. Railroad, 158 Mo. 226; Freeman & Hinson v. Railroad, 118 Mo. App. 527; Meriwether v. Railroad, 128 Mo. App. 647; Aull v. Railroad, 136 Mo. App. 379; Burgher v. Railroad, 120 S. W. 673; Mires v. Railroad, 134 Mo. App. 379; Libby v. Railroad, 137 Mo. App. 276; George

v. Railroad, 214 Mo. 551; Rice v. Railroad, 63 Mo. 314; Dawson v. Railroad, 76 Mo. 514; The Queen of the Pacific, 180 U. S. 58; Moore v. Railroad, 127 S. W. 92. (2) He received a reduced rate which was a consideration for the contract and this was proved by the contract and the testimony of Mr. McKnight, the station agent. Parol evidence is admissible to show the consideration for a reduced rate. Burgher v. Railroad, 120 S. W. 673.

*Ward & Collins* for respondent.

(1) Defendant can't limit its common law liability for negligence. Botts v. Railroad, 106 Mo. 397; Davis v. Railroad, 122 Mo. App. 637; Fulbright v. Railroad, 118 Mo. App. 482; Dawson v. Railroad, 79 Mo. 296. (2) And such contract limiting liability except for negligence, must have a consideration. Keyes-Marshal Co. v. Railroad, 113 Mo. App. 144; Paddock v. Railroad, 60 Mo. App. 328. (3) It was incumbent on the appellant to prove that Sparks Brothers Mule Company was the agent of plaintiff and authorized to make this contract. Bonner v. Lesenby, 86 Mo. App. 666; Christain v. Smith, 85 Mo. App. 117. (4) Appellant must show that the Sparks Mule Company had previous authorization to make this contract or a subsequent ratification by plaintiff. Hoppe v. Sailer, 53 Mo. App. 4; Boyle v. Railroad, 13 Mo. App. 574. (5) In the absence of fixed rates in dollars and cents, for freight on the shipment being specified in the contract of shipment, the rate to be charged was the customary rate, such as were fixed by the schedules showing the rate for freight and is not a reduced rate. Kellerman v. Railroad, 136 Mo. 188; George v. Railroad, 214 Mo. 554; Hancock v. Railroad, 131 Mo. App. 407; Borings v. Railroad, 90 Mo. App. 333; Ficklin Bros. v. Railroad, 115 Mo. App. 637; Davis v. Railroad, 122 Mo. App. 637; Fickland v. Railroad, 117 Mo. App. 211. (6) Said

contract did not state any rate, but left it in blank as follows, "At the rate of —— per ——, said rate being special rate, etc." These blanks in this alleged contract not being filled, there is no rate specified. George v. Railroad, 214 Mo. 554; Kellerman v. Railroad, 136 Mo. 188; Hancock v. Railroad, 131 Mo. App. 407.

NIXON, P. J.—An opinion was heretofore rendered in this case, but on motion, a rehearing was granted and the cause was reargued.

This was an action for one thousand dollars based upon the common law liability of the appellant in failing to deliver a carload of mules for the respondent within a reasonable time and in failing to transport said mules in a careful manner. The petition, so far as material, is as follows:

"That on the 17th day of December, 1908, plaintiff delivered to defendant and defendant received at the National Stock Yards in East St. Louis, Illinois, one carload of mules in good condition and valued at five thousand dollars, which said carload of mules defendant promised and agreed and then and there undertook, for and in consideration of certain freight charges paid, or to be paid to it, to well and safely carry, transport and deliver said mules to plaintiff in as good condition as when received by defendant, and to deliver same to plaintiff at Caruthersville, Missouri, within a reasonable time; that the distance was two hundred and twenty miles, and that twenty hours was a reasonable time within which to transport said property, and that defendant, by the exercise of reasonable diligence, could and should have transported same within twenty hours; but plaintiff charges and avers that defendant, unmindful of its duty as a common carrier and of its agreement as aforesaid, so negligently and carelessly conducted itself in the premises that it did not complete said transportation until forty-eight hours after said mules were delivered to defendant and by it

started en route for said transportation; and that it failed to carry said stock in a careful and safe manner, but negligently and carelessly bruised, wounded and injured said mules, and all of them were skinned, maimed and damaged in said transit, to the damage of plaintiff in the sum of one thousand dollars.''

The answer admitted that the respondent delivered to appellant the carload of mules as alleged in the petition, but denied all liability. Appellant also set up as a defense the contract of shipment entered into on December 17, 1908, wherein the value of the mules was fixed at one hundred dollars each, which valuation was fixed for the purpose of securing a reduced rate of freight on the shipment; that the appellant had two rates on live stock; that one was a rate based on a valuation declared by the shipper limiting the liability of the carrier to a certain sum in order to secure the reduced rate. The answer also set up the provision of said contract that as a condition precedent to recovery for any damages for delay, loss or injury to the mules, the plaintiff would give notice in writing of his claim therefor to some general officer or the nearest station agent of the defendant, or to the agent at destination, or some general officer of the delivering line, before the mules were removed from the place of destination, and before they were mingled with other stock, and that such written notice should be served within one day after the delivery of the mules at the point of destination, to the end that his claim could be investigated; and that failure to comply with this provision of the contract should operate to bar his recovery of all claims; and the defendant averred that plaintiff failed to comply with said provision of the contract. That plaintiff in making the contract expressly acknowledged that he had the option of moving his shipment under the tariff rate either at the risk of defendant, or upon a limited liability, and that he selected the limited liability to secure the reduced rate, and

agreed to all stipulations and conditions named in the contract; that no agent, under the terms of the contract, had any authority to waive, modify or amend any provisions therein.

For replication, the plaintiff denied under oath the execution of the contract, and averred that no contract was made by him which in any way limited the common law liability of the defendant.

At the trial, the plaintiff offered evidence tending to support the allegations of his petition. It was shown that he shipped the carload of mules over the defendant's line of railroad from East St. Louis to Caruthersville, a distance of two hundred and twenty miles, and there was evidence tending to show that twenty hours was a reasonable time for such transportation in the usual course of business; that through the defendant's negligence it took forty-eight hours to complete the shipment to Caruthersville, and that such time was an unreasonable delay; that by reason of such negligence and delay, the mules were maimed, injured and wounded. The carload of stock reached Hayti, six miles from Caruthersville, at 4:50 p. m. on December 18th, having been in transit at that time twenty-six hours and fifty minutes; that said stock instead of being brought on to Caruthersville was unloaded at Hayti and was not brought on to Caruthersville, according to plaintiff's testimony, until the next day at 3:00 p. m.; but according to defendant's evidence, they reached Caruthersville at 9:55 a. m. on the 19th. However, when the mules were unloaded at Caruthersville, they were in bad condition. All, or most of them, had a serious cold and running at the nose, and were skinned, bruised, wornout, drawn, cramped, tired and otherwise in bad shape by reason of the long delay in transit and the manner in which they were transported.

The plaintiff, during his testimony, stated that he had bought the twenty-eight mules of Sparks Bros.

in East St. Louis, and left them with Sparks Bros. for shipment, plaintiff coming away; that Sparks Bros. asked him what road he wanted them shipped over and he told them the St. Louis & San Francisco Railroad Company; that the same firm had shipped mules for him several times during a period of ten years, and that they did the directing of the car; that plaintiff had nothing to do with that; that after he made his order, he told Sparks Bros. over what route he wanted the mules shipped and trusted Sparks Bros. to ship them out. He says that he did not give the railroad company notice of his intention to claim damages as provided in the contract.

At the trial, the contract of affreightment was introduced in evidence, and is in part, as follows:

## ST. LOUIS AND SAN FRANCISCO RAILROAD COMPANY.

### READ THIS CONTRACT CAREFULLY, AS NUMEROUS CHANGES HAVE BEEN MADE.

#### Notice.

**THIS COMPANY HAS TWO RATES ON LIVE STOCK.**
Shippers of Live Stock will take notice that rates of freight, and the extent of liability of the Company, are governed by the valuations which they place thereon. Rates of freight are on file and will be shown by Agent on Application.

To the St. Louis and San Francisco Railroad Company:
The undersigned offers for shipment over your road 28 head of mules from National Stock Yards, Ill. to Caruthersville, Mo., each head of the estimated weight of 1000 pounds, and valued at One Hundred Dollars per head and .............. head of ..........
from ...................... to ..........................
each head of the estimated weight of ............ pounds, and valued at .................... Dollars per .............. which valuation is named by me for the purpose of securing a reduced rate of freight on this shipment; and I agree that in case of loss or damage to same said valuation so named shall be conclusive, should I make any claim for such loss or damage against any carrier over whose line the same may pass.

This application is an election on my part to avail myself of a reduced rate, by making this shipment under the following contract, limiting the liability of such carrier, instead of shipping the same at a higher rate without such limitations.

SPARKS BROS. MULE CO.
For J. M. McELVAIN,

WITNESS:                                    Owner or shipper.
    R. THOMPSON.

The St. Louis and San Francisco Railroad Company accepts this shipment and the above valuation as a basis for fixing the rate of freight thereon.

ST. LOUIS AND SAN FRANCISCO RAILROAD COMPANY,
By G. W. Thompson, Agent.

Note.—The rates of freight on Live Stock are fixed in view of the nature and extent of liability, assumed by the carrier, and all kinds of live stock shipped in car loads under contract similar to the following, limiting the liability of the carrier, are taken at reduced rates; all kinds of live stock will be taken at carrier's risk if the shipper so elects, at rates provided by the existing tariffs, classifications, and under the provisions and conditions relating thereto; and in either event no agent of this Company has any power to bind it in any way, with regard to the shipment of live stock, except by written contract.

## DUPLICATE.

### LIVE STOCK CONTRACT.

This agreement, made at National Stock Yards, Ill., station December 17, 1908, between the St. Louis and San Francisco Railroad Company, hereinafter called "the Company," party of the first part, and J. M. McElvain, hereinafter called "the shipper," of the second part, Witnesseth: That for and in consideration of the considerations hereinafter mentioned, the party of the first part will transport for the said second party, the following cars of Live Stock described below, and the parties in charge thereof, as hereinafter provided, viz.: One car said to contain 28 head of mules and being consigned to J. M. McElvain from National Stock Yards, Ill., station to Caruthersville, Mo., station on the line of the Company, and at said last named station to deliver the same to a carrier, whose line may form a part of the route to...................... hereinafter called the place of destination, at the rate of ........ per......said rate being a special rate and less than the rate charged for shipments transported at carrier's risk; in consideration of which reduced rate it is mutually agreed between the parties hereto as follows:

*   *   *   *   *   *   *   *   *   *   *   *

11th. That, as a condition precedent to a recovery for any damages for delay, loss or injury to Live Stock covered by this contract, the second party will give notice in writing of the claim therefor to some General Officer or the nearest station agent of the first party, or to the agent at destination, or some General Officer of the delivering line before such stock, is removed from the point of shipment or from the place of destination, and before such stock is mingled with other stock, such written notification to be served within one day after the delivery of such stock at destination, to the end that such claim shall be fully and fairly investigated; and that a failure to fully comply with the provisions of this clause shall be a bar to the recovery of any and all such claims.
* * * * * * * * * * *

G. W. THOMPSON, Agent.
For the St. Louis and San Francisco Railroad Co.
SPARK BROS. MULE CO., Shipper.
For J. M. McElvain.

Witness:
R. THOMPSON.

R. L. Ward, plaintiff's attorney was placed on the stand as a witness for the defendant and gave testimony as follows: "Q. You are attorney for the plaintiff in this case? A. Yes, sir. Q. Will you examine this contract? (Which the witness does.) Q. You have produced this contract in court this morning? A. Yes, sir. Q. Tell how you obtained this contract. A. I wrote to Sparks Bros. Upon an inquiry as to when the mules in controversy were shipped, when loaded out and their condition, together with the letter they sent me in answer to those inquiries this, what do you call a contract." Cross-examination: "I will state that was sent me after the suit had been filed here, and as far as I am advised Mr. McElvain never saw this contract and didn't know I had it until this morning. I showed him the date as to when it showed they had been shipped."

J. A. Moran, a witness for the defendant, testified, in part as follows: "Am cashier of the Frisco at Hayti, Mo., and was located there in December, 1908. Q. Examine that and state if it is the standard form of shippers' contract of live stock over the Frisco railroad. (Witness is shown contract offered in evi-

dence and marked 'Exhibit A.') A. Yes, sir.". Cross-examination: "Don't know whether Jerre McElvain signed that or not. Don't know anything about this contract; it is *the first I ever saw it.* That is the standard contract; it is the only kind we have for live stock. When a man makes a shipment of stock we give him this form and give him a bill of lading. Don't know how much freight this man was charged; according to this standard form he was charged what everybody else was charged, unless released at that valuation. Couldn't say what rate would be charged according to this valuation without looking at my tariffs; he was charged under the tariff under that contract, and this is the tariff rate so far as I know."

J. R. McKnight testified for the defendant as follows: "I am the station agent at Caruthersville and have been ever since November, 1908. The freight rate of shipment from East St. Louis to St. Louis on a carload of mules or horses is $4.00 a car; that is the terminal, across the river to St. Louis; and the rate from St. Louis to Caruthersville is twenty-one cents a hundred. Q. When you say hundred, you mean in weight or value? A. Twenty-one cents per hundred pounds, the weight of the stock. Q. Is there any difference as to value? A. Yes, sir. Q. What is that now? A. Well, in case of horses and mules, why it is $100 valuation per head, it takes a twenty-one cent rate. Q. If there was more than $100 per head, what is the rate? A. Twenty-five per cent. Q. Twenty-five per cent of what? A. Of the increase. I will read this: 'When the declared value exceeds the above, an addition of twenty-five per cent will be made to the rate per hundred pounds.' That I understand to be twenty-five per cent of the twenty-one cents, which would make it about twenty-six and one-fourth cents instead of twenty-one. Q. The shipper then has the option of fixing the value? A. Yes, sir. Mr. Ward:

·We object to that; let him state. Q. What right has the shipper with reference to fixing the rate as to the value? A. Well, he can release a car or he can't release it, just as he likes. Q. What do you mean by releasing? A. What I mean by releasing a car, is releasing $100 per head. Q. Or can he make it higher? A. Yes, sir; if it is above that he doesn't value it at all. Q. What? A. If you release at $100 a head, that is twenty-one cents, and if you don't release it, it doesn't state any valuation, it is twenty-five per cent above that. Q. That is to say, when it is a $100 valuation you fix it at twenty-one cents? A. Yes, sir. Q. When it is fixed above that, you just add the twenty-five per cent? A. It takes an increase of twenty-five per cent on the rate. Q. Shipper has the privilege of accepting the two rates, has he? A. Yes, sir; the only thing further about it is that we are not to take any stock valued at over $800 a head. Q. Now those are the rates which have been furnished you as approved by the Interstate Commerce Commission, are they? A. Yes, sir." Cross-examination: "Q. Now, what did they charge McElvain on this occasion? A. Here is the expense bill right here, $53.72, I believe is what I collected. Q. You charged him the only rate you have got, with the exception, not counting in this $100 valuation? A. Here is 23,200 pounds at twenty-one cents, makes $4872; terminal, that is, transfer, $4 ; bedding, $1. Q. The only difference then to get the reduced rate is to place the value of the mules at a less value? A. If you value at $100 you get the twenty-one cents. Q. But you don't get any reduced rates by signing a contract to limit your liability except as to the $100 valuation? A. Here is the valuation, up there; if if he wants to release it he signs his name under the valuation there; otherwise he doesn't. Q. That reduction goes only to the contract—as concerning the valuation of the mules? A. I don't understand

what you mean. Q. That reduction between twenty-one and twenty-six cents is made only upon his reducing the value of his mules? A. The only thing, he had an option, you understand, of valuing his mules at $100 and if he wants to accept the twenty-one cent rate, which is the cheapest rate, he has a right of doing that by signing the contract to that effect. Q. As to the value? A. Yes, sir. Q. But that has nothing to do and you have no other contract concerning—limiting his common law liability in any other way? Mr. Whybark: His common law liability should be explained. A. Well, the contract calls for the valuation. Q. The difference between twenty-one cents and twenty-six cents is not a consideration for him signing any part of this contract except lessening the value of the mules? A. Yes, sir; if he signs that to value the mules at $100 per head he gets a smaller rate. Q. And that is all that less value is for? A. Which the smallest rate? Q. Yes, sir. A. Yes, sir; there are two rates, higher and lower rate. Q. Depending altogether on the value of the stock and nothing else? A. Yes, sir." Re-direct examination: "Q. Suppose I ship a mule that is worth $100 from St. Louis to Caruthersville and value him at $100 under the contract, what would be the rate if he weighs 1000 pounds? A. The rate is twenty-one cents if valued at $100. Q. Suppose I ship a mule weighing 1000 pounds which is worth $500 and I don't sign the release, what would be the rate? A. It would be twenty-five per cent more. Q. So when I sign this contract, as you state, this is what determines the value of it? A. Yes. sir. Q. The signing of that? A. Yes, sir, you either release it or you don't release it, according to whether you sign it or don't sign it. Q. So if I should ship a mule that weighed 1000 pounds and vauled him at $100 I would only pay twenty-one cents? A. Yes, sir, that is twenty-one cents rate from St.

Louis; that does not include—Q. From. St. Louis here? Yes, sir. Q. But if I didn't release it I would pay twenty-five per cent more? A. Yes, sir. Q. Do you know what the rate would be from East St. Louis? A. Well, it was $4 a car. Q. Where one mule or a dozen? A. Yes, sir.''

Plaintiff obtained judgment in the sum of $560 from which the defendant has appealed.

At the conclusion of the evidence in the trial court, the defendant tendered and the court overruled a demurrer to the evidence. Defendant also asked and the court refused to give the following declaration of law:

''5. The court further declares the law to be that by the contract of shipment entered into between the plaintiff and the defendant, as a condition precedent to recovery for any damages, delay, loss or injury to his stock shipped, it was agreed that plaintiff should give notice, in writing, of his claim therefor to some general officer or the nearest station agent of the defendant, or to the agent at destination, or some general officer of the delivering line, before his stock were removed from the point of shipment or from the place of destination, and before they were mingled with other stock, and that such written notification was to be served within one day after the delivery of his said mules at destination, to the end that his claim, whatever it may be, should be fully and fairly investigated, and that a failure to fully comply with the provisions of this clause should be a bar to a recovery of any and all such claims; and if the court finds from the evidence that the plaintiff failed to give such written notice, as required by said provision in said contract, and within the time, to-wit: one day after the delivery of his stock at Caruthersville, then he is not entitled to recover, and the court will find the issues for the defendant.''

Questions relating to the other defenses set up in defendant's answer have been raised and were properly decided in respondent's favor, but their discussion is unnecessary under the view we have taken of this case.

The contract of shipment, in consideration of the reduced rate, specially provided that before a recovery could be had for delay, loss or injury, a notice in writing of the claim therefor must be served within one day after the delivery of the stock at destination and before the stock was removed from the place of destination and before being mingled with other stock. Plaintiff testified in so many words that no such notice was given.

The evidence shows that plaintiff was not present in East St. Louis at the time the shipment was made; that he purchased the mules of Sparks Bros. who were directed by him to ship them, and plaintiff went away; that it was his usual practice whenever he bought mules to allow the party from whom he purchased them to do the shipping, and that such parties put the directions on the car and attended to the shipment, and that plaintiff had nothing to do with that; that he trusted in this instance to Sparks Bros. to ship them out for him. Plaintiff claims that Sparks Bros. were not his agents for the purpose of making the contract offered in evidence limiting the liability of the carrier; that he knew nothing of their having made such a contract, and he filed an affidavit in the nature of a plea of *non est factum* in his reply denying the authority of Sparks Bros. to execute this contract. The bill of lading containing the contract limiting the liability of the railroad company was offered in evidence and was in the possession of the plaintiff at the trial and it was not denied that the contract was executed by Sparks Bros. for the plaintiff at the time of the shipment of his carload of mules, the contro-

versy upon this point being as to their authority to execute the same as his agents.

When goods are put in charge of an agent to deliver to a carrier, he is presumed to have authority to make the necessary contracts at the point of shipment, and such authority includes all the necessary and usual means for carrying the contract into effect. One of the necessary incidents to the shipment is to arrange with the carrier to receive the goods and route them and agree on terms of shipment. Accordingly, it is a general rule that the shipping agent must be regarded as having authority to stipulate for and accept the terms of transportation. This includes authority to assent to the usual terms of such contracts releasing carriers from their strict common law liabilities as common carriers of goods. [31 Cyc. 1402; Craycroft v. Atchison, T. & S. F. R. Co., 18 Mo. App. 487.] Under the law governing principal and agent, Sparks Brothers, under the authority given them by the plaintiff, undoubtedly had power to execute for him the contract of affreightment, and plaintiff is bound by their acts.

The provision of the contract requiring written notice, when reasonable, has been uniformly upheld by the courts. Its purpose is to enable the carrier, while the occurrence is recent, to better inform itself of what the actual facts occasioning the loss or injury are and thus protect itself against claims which might be made after such a lapse of time as to make it difficult if not impossible to ascertain the truth and protect itself from imposition and fraud. It is, therefore, not an unreasonable condition that the shipper should be required, as a condition precedent to enforcing liability against the carrier, to give notice of his claim according to the reasonable conditions of the contract. [Hutchinson on Carriers (3 Ed.), sec. 442.] The effect of such agreement is to require the one who has the peculiar knowledge to inform the other who has

not that knowledge of the fact or facts where they exist so that the facts may be obtained and presented by both sides. Its effect is, therefore, to uphold and enforce rights if they are founded in truth and justice, and not to limit or defeat those rights. [6 Cyc. 505; Kalina v. Railroad, 76 Pac. 438; The Westminster, 127 Fed. 680.] The courts of this state have uniformly upheld and enforced similar contracts, when supported by a valuable consideration, where they were not unreasonable and the damage occurred in the transportation of goods. [Shelton v. St. L. & S. F. R. Co., 131 Mo. App. 560, 110 S. W. 627; Freeman v. K. C. S. Ry. Co., 118 Mo. App. 526, 93 S. W. 302; Meriwether v. Q., O. & K. C. R. Co., 128 Mo. App. 647, 107 S. W. 434; Aull v. Mo. Pac. Ry. Co., 136 Mo. App. 291, 116 S. W. 1122; George v. Chicago, R. I. & P. Ry. Co., 214 Mo. 551, 113 S. W. 1099; The Queen of the Pacific, 180 U. S. 49, 58; Freeman v. St. L. & S. F. R. Co., 138 Mo. App. 322, 122 S. W. 1; Moore v. St. L. & S. F. R. Co., 143 Mo. App. 675, 127 S. W. 921.]

The notice required by the contract could readily and conveniently have been given to the station agent at Caruthersville as required by the contract before the removal of the mules, and thus an opportunity would have been afforded the carrier to have examined the mules and found to what extent they were injured before they were mingled with other stock. The shipper here agreed to this provision, and as to whether his agents—Sparks Brothers—had forwarded the contract containing this provision so that he would be informed of the necessity of complying with such contract would make no difference. He had employed Sparks Brothers as his shipping agents and was bound by the provisions of the contract, and ample time had elapsed in order to have obtained his contract of affreightment before the mules arrived at the point of destination. The plaintiff claims that he had no notice that his agents had made any contract in his behalf as

to the shipment of the carload of mules and that he knew nothing as to such contract until the day of the trial. The law is that notice to the agents was notice to the plaintiff. The principal is charged with implied knowledge of the existence of such facts as are within the knowledge of the agent in the particular business confided to him by his principal. [O'Neill v. Blase, 94 Mo. App. 648, 68 S. W. 764; Kenneth Inv. Co. v. Bank, 96 Mo. App. 125, 70 S. W. 173.]    There is no evidence in this case that Sparks Brothers, when acting as shipping agents for the plaintiff in executing the contract as to notice, were not acting in the utmost good faith in the supposed interest of the plaintiff and to secure for him the most advantageous rate; nor is there any evidence that they were not apprised of all the terms and conditions of the contract they signed; nor was there any evidence of the least imposition or fraud on the part of the defendant corporation.

The validity of the provisions in the contract as to the carrier's limitation of liability are challenged on the ground that they are not supported by any consideration. In many jurisdictions outside of Missouri, such stipulations requiring written notice before the removal of stock from cars at destination by the shipper are upheld as proper regulations, and as such are valid without any independent consideration. Generally speaking, the theory of such authorities is that if the contract in that respect is just, in view of the circumstances of the particular case in judgment, such stipulations are sustained as provisions which a carrier may insert in the contract as a reasonable regulation of the shipper's right, notwithstanding its common law obligation to carry. Such authorities hold that instead of being a limitation upon the carrier's liability at common law, they are no more than a reasonable regulation touching the shipper's right, or a regulation going to the remedy, and as such they are enforced even in negligence cases, if otherwise reason-

able and just. But such are not the conclusions which have been announced by our own Supreme Court, and its decisions foreclose an examination of that subject. The doctrine of our Supreme Court is that these limitations, instead of being mere regulations which a carrier may insert in the contract requiring diligence and dispatch on the part of the shipper, are in fact limitations upon the common law liability of the carrier, and, unless supported by a separate and independent consideration, the stipulation requiring the claim and notice is wholly invalid. [George v. Chicago, R. I. & P. Ry. Co., supra.] Therefore, a mere agreement by the parties to transport does not of itself furnish a consideration for the agreement to limit the carrier's common law liability. In order to bind the shipper in such cases, a sufficient consideration, independent of that for the transportation alone, must appear. A reduced rate of freight is a proper consideration and is that usually employed as an inducement for such contracts. [McFadden v. Mo. Pac. Ry. Co., 92 Mo. 343, 4 S. W. 689; Kellerman v. K. C., St. J. & C. B. R. Co., 136 Mo. 177, 34 S. W. 41, 37 S. W. 828.] The parties plaintiff and defendant, so far as appears, executed the contract of affreightment with full knowledge of its contents, and any statement in the contract is an admission of the facts stated and in the absence of countervailing facts is conclusive, for no reason can be assigned why written statements in the nature of admissions in such contracts have not the same probative force as evidence as admissions of a party in any other contract. We know of no reason why parties to a shippers' contract may not recite that it was made for a consideration, nor why such a statement when made would not be competent evidence of a consideration. [1 Hutchinson on Carriers (3 Ed.), sec. 475; 4 Elliott on Railroads (2 Ed.), sec. 1504, 1500.] The admission in a shippers' contract that it is made for a valuable consideration is prima facie evidence

of that fact. The contract of affreightment in the present instance contains a recital to the effect that the carrier had two rates and that the shipper applied for the reduced rate and valued each mule at one hundred dollars for the purpose of securing the reduced rate of freight on the shipment, and that the application of the shipper was an election by him to avail himself of the reduced rate by making the shipment under the contract limiting the liability of the carrier instead of shipping at the higher rate without such limitation. It is true the specific rate in dollars and cents is not given, but the recital of a reduced rate of freight in a shippers' contract to which the shipper has assented is prima facie evidence of that fact and is sufficient to support a verdict when nothing to the contrary appears on the face of the contract. [Meyers v. M., K. & T. Ry. Co., 120 Mo. App. 288, 96 S. W. 737; McFadden v. Mo. Pac. Ry. Co., supra; Wyrick v. M., K. & T. Ry. Co., 74 Mo. App. l. c. 414; Burgher v. Wabash R. Co., 139 Mo. App. l. c. 67, 120 S. W. 673; Phoenix Powder Mfg. Co. v. Wabash R. Co., 196 Mo. l. c. 669, 94 S. W. 235; Wabash R. Co. v. Sloop, 200 Mo. 198, 98 S. W. 607; Holland v. C., R. I. & P. Ry. Co., 139 Mo. App. 702, 123 S. W. 987.]

Were we to follow the decisions of the Federal courts in this case because the contract in question grew out of an interstate shipment, the consideration expressed is sufficient to support the special limitation on the common law liability. In the case of Cau v. Railway, 194 U. S. 428, the Supreme Court of the United States said: "It is again urged that there was no independent consideration for the exemption expressed in the bill of lading. This point was made in York Co. v. Central Railroad Co., supra. In response it was said: 'The second position is answered by the fact that there is no evidence that a consideration was not given for the stipulation. The company, probably, had rates of charges proportioned to the risks they

assumed from the nature of the goods carried, and the exception of losses by fire must necessarily have affected the compensation demanded. Be this as it may, the consideration expressed was sufficient to support the entire contract made.' In other words, the consideration expressed in the bill of lading was sufficient to support its stipulations."

The construction of the Hepburn Act and the scope of its operation is a Federal question, and as to such question the state courts will follow and are bound by the decisions of the Federal courts. But contracts for reduced rates, not being affected by such law, no federal question arises and no federal right is involved, and hence the state courts are free to apply their own rules to its construction.

In reaching a correct conclusion in the present case, the particular language of the contract is to be considered. It is a different contract from the one passed on in the George case. This contract contains a special agreement as to the value of the property to be shipped, and by its terms fixes the maximum value at the specified amount of one hundred dollars on each mule, which is fixed by the shipper for the purpose of securing a reduced rate of freight on the shipment, and provides that said reduced rate is a special rate, less than the rate charged for shipments transported at the carrier's risk, in consideration of which reduced rate the parties mutually agreed, among other things, to the terms of the contract as to the shipper giving written notice if damages for injuries to stock was claimed, and that such notice should be given before the stock was removed from the place of destination. Of course it would necessarily follow that no prima facie case would be made, because no consideration is shown to support the shippers' contract, if the contract on its face disclosed that "no reduced rates are contracted for" or that the rate charged was a full tariff rate, or that there was no special or reduced rate. In the

George case, after a most exhaustive and painstaking
review of all the cases that had arisen in this state,
the Supreme Court based its decision upon the special
language of the shippers' contract and approvingly
quoted from the case of Kellerman v. K. C., St. J. &
C. B. R. Co., supra, the following language upholding
the validity of such contract: " 'It will be observed
that in all the cases cited upon the question now under
consideration, there was an express agreement as to
the value of the property, or its maximum value fixed
at a specified amount in consideration for special or
reduced rates, while no reduced or special rates were
contracted for in the case at bar, nor was the value
of the bull fixed at a specific sum. . . . Under these
authorities we must hold that there was no considera-
tion for the maximum value placed on the bull and
the contract in that respect is void.' " . Referring to
this language, the court in the George case said: "We
call notice again to the fact that the recital in the con-
tract in that case as to the freight rate charged was
exactly like the recital in the case at bar, that is, 'at
the rate of —— tariff per cwt.,' and the court said it
meant the full tariff rate and therefore there was no
special or reduced rate and therefore there was no con-
sideration to support the contract." In other words,
when a shippers' contract recites that the rate charged
is the "tariff rate," it is to be construed as the highest
rate a carrier can charge, and such a recital in the
shipping contract that the "tariff rate" was charged
will control over a recital that the rate was less than
the rate charged for shipments transported at the car-
rier's risk. [Holland v. C. R. I. & P. Ry. Co., supra.]

The provision of the shippers' contract under con-
sideration was evidently drawn for the purpose of
meeting the ruling of the Supreme Court in the George
case, and it seems adequate for that purpose. We find
no substantial discrepancy between the decisions of our

Supreme Court in the construction of shippers' contracts like the one at bar. Such apparent conflict disappears when we take a discriminating view of the special terms of the two classes of contracts and apply the legal maxim, *ex facto jus oritus*.

In the present case, the appellant did not rely alone on making a prima facie case by simply offering in evidence the contract, but proceeded to offer independent evidence showing a consideration and the testimony of witness McKnight tended to corroborate the written statements and admissions contained in the shippers' contract. It is claimed by the respondent that the evidence of the defendant's witness, Moran, tended to show that the defendant company had only one rate on shipments of live stock instead of two and that his testimony on that question authorized the court sitting as a jury to find such issue for the respondent. Moran was a cashier for the defendant company at Hayti, Missouri, and there is no showing that he had any such official connection with the defendant company as would give him any knowledge on the rate question. As a witness, he is shown a written contract and testifies that he does not know whether plaintiff signed it or not, that he never saw it before, and expressly states that he does not know how much freight McElvain was charged. The witness then proceeds to state his conclusions as to a written and standard form of contract presented to him to the effect that "he was charged what everybody else was charged unless released at that valuation." The writing to which the witness refers is not offered in evidence nor is its contents given. The witness further states that he could not say what tariff would be charged under the valuation shown him, but that this was a tariff rate as far as he knew.

To sustain a finding from such proof that the defendant company had only one rate as against the recitals in the written contract and the testimony of J. R. McKnight, the station agent of the company at

Caruthersville, would be to give vitality and substance to baseless conjectures; a proceeding which our Supreme Court in the interest of justice between man and man has wisely condemned. [Felver v. Central El. Ry. Co., 216 Mo. 195; 115 S. W. 980.]

Nor can we agree to the further contention, so ingeniously and ably urged by respondent's counsel, that the plaintiff, by Sparks Bros., executed two separate and independent contracts, and that each one of them must be supported by its own consideration, and that the evidence fails to show any consideration for the second contract designated "Live Stock Contract." We cannot think after a careful reading of this contract that there can be two conclusions as to its meaning. At its very commencement, it is headed in bold type: *"Notice. This company has two rates on live stock. Shippers of live stock will take notice that rates of freight, and the extent of liability of the company, are governed by the valuation which they place thereon."* Then follows an application by the plaintiff to the defendant company in which the shipper offers for shipment over the defendant's railroad twenty-eight head of mules of the estimated weight of one thousand pounds each and valued at one hundred dollars per head "which valuation is named by me for the purpose of securing a reduced rate of freight on this shipment. . . . . This application is an election on my part to avail myself of a reduced rate, by making this shipment under the following contract, limiting the liability of such carrier; instead of shipping the same at a higher rate, without such limitations." Then follows the acceptance by the defendant company of the shipment and the valuation agreed on as the basis for fixing the rate of freight thereon. Then follows a notice stating that "the rates of freight on live stock are fixed in view of the nature and extent of the liability, assumed by the carrier, and all kinds of live stock shipped in carloads under a contract similar to the following, limiting

the liability of the carrier, are taken at reduced rates; all kinds of live stock will be taken at carrier's risk if the shipper so elects, at rates provided by the existing tariffs, classifications, and under the provisions and conditions relating thereto." Then follows the contract referred to in the application of the plaintiff entitled "Live Stock Contract" in which the agreement of the parties is recited "that for and in consideration of the considerations hereinafter mentioned," the railroad company undertakes to transport the mules from the National Stock Yards, in Illinois, to Caruthersville, Missouri, at the rate of —— per ——, said rate being a special rate and less than the rate charged for shipments transported at carrier's risk, in consideration of which reduced rate it is agreed between the parties, among other things, that in case of loss or damage to the stock the plaintiff would not claim to exceed one hundred dollars per head, and that in case of damage to the stock during transportation, "as a condition precedent to a recovery for any damages for delay, loss or injury to live stock covered by this contract, the second party will give notice in writing of the claim therefor to some general officer or the nearest station agent of the first party, or to the agent at destination, or to some general officer of the delivering line, before such stock is removed from the point of shipment or from the place of destination, and before such stock is mingled with other stock, such written notification to be served within one day after the delivery of such stock at destination, to the end that such claim shall be fully and fairly investigated; and that a failure to fully comply with the provisions of this clause shall be a bar to the recovery of any and all such claims." So we think it is apparent that what plaintiff's counsel calls two contracts was written on the same piece of paper and executed by the same parties at the same time as a part of the same transaction and constitutes one contract supported by the one consideration.

The valuation of the mules at one hundred dollars each was a reduced valuation. The testimony of the plaintiff was to the effect that their market value was from one hundred and forty dollars to one hundred and seventy dollars per head. By valuing them at one hundred dollars per head, plaintiff was enabled to make the shipment at the rate of twenty-one cents per hundred pounds, instead of paying twenty-five per cent more than that rate if they were placed at their full value, making a difference of twelve dollars and eighteen cents in plaintiff's favor on that particular shipment. It was competent to show by proper evidence that there was only one rate, and hence no reduced rate. The valuing of the mules at one hundred dollars each, under the terms of the contract, was a consideration for the reduced rate.

Another contention of the respondent is that the contract as to the limitation of its liability is invalid because it was an interstate shipment, and that under the Federal law—the Carmack amendment to the Hepburn act—it is void whether or not it is supported by a consideration.

The complaint here is a common law action. No federal question is presented by the pleadings. The shipment was an interstate one. The Interstate Commerce Act is a part of the law of the State of Missouri, and enforceable in its courts when rights under it or given by it arise as incidents of a trial. [Pittsburg, C. C. & St. L. Ry. Co. v. Mitchell, 91 N. E. 735.]

An interstate common carrier is free to exercise all its rights under the common law to the full extent unless such exercise has been made unlawful by the Interstate Commerce Act. [Union Pac. Ry. Co. v. Updike Grain Co., 178 Fed. 223.] The Interstate Commerce Act [Act Feb. 4, 1887, c. 104, 24 Stat. 386, (U. S. Comp. St. 1901, p. 3169), passed June 29, 1906 (Act June 29, 1906, c. 3569, sec. 7, 34 Stat. 593), U. S. Comp. St. Supp. 1907, p. 906] reads as follows: "That any

common carrier, railroad or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder' thereof for any loss, damage or injury to such property caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed: provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law. That the common carrier, railroad or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad or transportation company on whose line the loss, damage or injury shall have been sustained, the amount of such loss, damage or injury as it may be required to pay to the owners of such property as may be evidenced by any receipt, judgment or transcript thereof.'' This statute, as is apparent, changes the common law rule as applied in many states respecting the non-liability of the first carrier for loss occurring on the line of connecting carriers, in interstate shipments.

''It has been heretofore held at common law, and frequently stipulated by express provisions of shipping contracts that the liability of each carrier is confined to losses occurring on his own line. This rule, in cases of interstate carriage, has now been abrogated, and hereafter the initial carrier remains liable to the shipper for losses occurring on the lines of connecting carriers, as well as on his own, having a right of recovery over against the connecting carrier if the loss has occurred on the line of the latter. The defendant's contention is that this is the whole extent to which the

statute has abrogated or changed the existing rule. The plaintiffs insist that the statute goes further. The words upon which plaintiffs rely are that any common carrier 'shall be liable to the lawful holder thereof for any loss, damage or injury to such property (the merchandise shipped) caused by it . . . and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed.' '' [Greenwald v. Weir, 115 N. Y. Supp. l. c. 314.]

It will be seen by the terms of this statute—the Carmack amendment to the Hepburn Act—that it forbids the making of a contract, receipt or regulation exempting the carrier from the liability imposed by the statute. There is but one liability which can properly be said to be imposed by the statute, and that is the liability of the initial carrier for a loss occurring on the line of a connecting carrier. This is a new liability, created and imposed by the statute. The liability of the carrier for losses occurring on its own line is not new; it is not created or imposed by this statute, but existed before the statute was passed. The statute is completely satisfied, therefore, by construing it as creating and imposing on the initial carrier a new liability, and forbidding an exemption by stipulation or agreement from that new liability, which, as we have stated, is the liability of the initial carrier for losses occurring on the line of a connecting carrier. The use of the word ''exempt,'' as applied here, is to prevent a carrier from relieving himself altogether from the liability for a loss occurring on the line of a connecting carrier, but the use of the word ''exempt'' is ''wholly inappropriate if intended to provide an agreement between the carrier and the shipper as to the value of the goods to be shipped.'' [Greenwald v. Weir, 115 N. Y. Supp. l. c. 314.] In other words, the Interstate Commerce Act has no effect in any way to limit the contract between the shipper and the carrier for a reduced rate.

[Bernard v. Adams Express Co., 91 N. E. 325; Greenwald v. Weir, supra; Pittsburg, C. C. & St. L. Ry. Co. v. Mitchell, supra; St. Louis, I. M. & S. Ry. Co. v. Furlow, 117 S. W. 517; Greenwald v. Barrett, 92 N. E. 218; Travis v. Wells, Fargo & Co., 74 Atl. 444; Latta v. Chicago, St. P. M. & O. Ry. Co., 172 Fed. 850; 13 Interstate Commerce Com. Reps. 550.]

But although the shippers' contract is clearly unambiguous and prima facie what it purports to be, the question whether it was made and entered into understandingly and in good faith for the purpose stated and so as to constitute a contract at all, must be determined from the facts and circumstances surrounding its execution. For the purpose of showing that the plaintiff did not assent or agree to the terms of the contract, extrinsic evidence is admissible, not to contradict its express terms, but to show whether it was fairly and honestly entered into. [Boorman v. Express Co., 21 Wis. 152; King v. Woodbridge, 34 Vt. 565; Black v. Railway Co., 101 Ill. 352; O'Malley v. Great N. Ry. Co., 90 N. W. 974; Madam v. Shevard, 73 N. Y. 329.]

There can be no limitation of liability without the assent of the shipper and there can be no valid stipulation for an exemption by a carrier which is not reasonable in the eye of the law. [Cau v. Railway, supra.] If the plaintiff contends that his signature to this shippers' contract, which includes the release pleaded by the defendant, was fraudulently and wrongfully procured from his agents, he should have tendered that issue by proper allegations in his reply as provided by section 654, Revised Statutes 1899. [Freeman v. St. L. & S. F. R. Co., 138 Mo. App. 322, 122 S. W. 1.] If the carrier did not allow the shipper the privilege of choosing between a restricted and a full liability, or if the pretended agreed valuation is not such in fact, but simply a cloak for a limitation of liability to a fixed sum which is less than the real value, the contract will not be valid as against a loss due to negligence. [6 Cyc.

401.] There being no evidence of fraud or imposition in the procurement of the shippers' contract, and no evidence by respondent to overcome the prima facie showing that the contract was supported by a consideration, the court erred in refusing to give appellant's declaration of law number 5. The hardship of allowing carriers to restrict by contract their common law liability has led to such contracts being entirely prohibited by several states; but until the Legislature otherwise declares, they must be enforced by the courts. The right of the state to legislate is recognized by the Carmack amendment to the Hepburn Act. [Latta v. Chicago, St. P. M. & O. Ry. Co., supra.]

It therefore follows that the judgment should be reversed and the cause remanded. However, the decision which we have reached is in conflict with the opinion of the Kansas City Court of Appeals in the case of Holland v. Chicago, R. I. & P. Ry. Co., 139 Mo. App. 702, 123 S. W. 987, on the interpretation of the Carmack amendment to the Hepburn Act, and with the opinion of the St. Louis Court of Appeals in the case of Blackmar & Post Pipe Co. v. M. & O. R. Co., 137 Mo. App. 479, 119 S. W. 1, on the same proposition, and this case is accordingly certified to the Supreme Court for its decision. All concur.