BOMMARITO

v.

SOUTHERN CANNING CO.

No. 14835.

United States Court of Appeals
Eighth Circuit.

Nov. 19, 1953.

Rehearing Denied Dec. 8, 1953.

Before GARDNER, Chief Judge, and WOODROUGH and COLLET, Circuit Judges.

WOODROUGH, Circuit Judge.

This was an action in replevin instituted by the Southern Canning Company to recover personal property from Jerome Bommarito, doing business as Cardinal Products Company, and for damages in the amount of $10,000 for breach of contract. Defendant answered by way of a general denial and counterclaimed for damages in the sum of $50,000, alleging a breach of contract on the part of plaintiff. A jury was waived. Judgment of possession was rendered for the plaintiff and damages were denied to both parties, whereupon defendant prosecutes this appeal. The parties will be referred to as they appeared in the court below.

Plaintiff is a Texas corporation engaged in the manufacture and sale of dog food, among other things. In the fall of 1950 it desired to establish a processing and distributing plant in St. Louis to provide dog food for its customers in several mid-western states and had negotiations to that end with defendant's father. He and his wife, defendant's mother, owned a building at 4027 Easton, St. Louis, Missouri, where he was carrying on business under the trade name "Cardinal Products Co." Pursuant to the negotiations and an oral agreement entered into with the father, the plaintiff moved its machinery and equipment, which is the subject matter of this suit, into the building, and the dog food was manufactured there for several months but without any written agreement to evidence the terms and conditions. The plaintiff tendered several forms of agreement for the father's signature but he always refused to sign a written contract. In April, 1951, Cardinal Products Co. was turned over to defendant and thereafter all negotiations concerning the business were carried on between plaintiff and defendant.

After several conferences and preliminary drafts an instrument entitled "Lease and Contract" was drawn up on

Daniel Bartlett, St. Louis, Mo. (Harry Gershenson and H. Jackson Daniel, St. Louis, Mo., were with him on the brief), for appellant.

Thomas Rowe Schwarz, St. Louis, Mo., (John S. Leahy, St. Louis, Mo., was with him on the brief), for appellee.

May 3, 1951, intended to specify the respective obligations to be assumed by the several parties to be concerned in the manufacture of plaintiff's dog food by the defendant with the plaintiff's machinery, equipment and supplies on his parents' property in St. Louis. It recited that the machinery and equipment of the plaintiff referred to were already located upon the property of the parents and were to remain the property of the plaintiff but defendant was to bear the expense of its maintenance and repair. The agreement was to extend for a period of two years and continue for an additional five years unless terminated by either party after giving four months written notice. It was provided that defendant could move to a new location after giving plaintiff 30 days written notice of his intention to do so. There was also a provision that plaintiff would pay defendant $350 at the termination of the contract for changes made and damage already done to the building of the parents.

Thus the terms and conditions of the instrument included and defined obligations necessary to be assumed by the plaintiff as the intended provider of machinery and supplies, by the defendant as intended operator of the plant and by defendant's parents as the recognized owners of the premises intended to be used in the operations. The instrument accordingly left blank spaces to be signed by each of those expected to become obligated. In drawing it up the scrivener first specified the numerous affirmative acts of cooperation required of the plaintiff and defendant to carry on the manufacturing business on the property of the parents and provided blank spaces thereunder for plaintiff's and defendant's signatures. Following that blank space the instrument provided:

"We, the undersigned, Antonina Bommarito, and Joseph Bommarito, her husband, owners of property 4027 Easton Avenue, St. Louis, Missouri, have read the above contract and herewith ratify the authority of Jerome Bommarito to enter into such contract and agree that he may have the peaceful and undisputed possession of said premises during the existence of said contract or any extension thereof, it, however, being understood that we in no wise obligate ourselves to see that Jerome Bommarito or any one acting on his behalf performs the terms and conditions of said contract, and it is further understood that we in no wise will be responsible for any damage that may result in the event it is contended that Jerome Bommarito has not performed the terms and conditions of said contract.

. . . . . . . . . . . . . . . . . . . . . . . . . . .
Antonina Bommarito.

. . . . . . . . . . . . . . . . . . . . . . . . . . .
Joseph Bommarito.          ".

Defendant signed the agreement on May 3, 1951, and it was sent to plaintiff's home office in Texas where it was signed by the president of plaintiff company, impressed with the corporate seal, and returned to defendant. Defendant immediately mailed it to California where his parents were at the time. Shortly thereafter defendant's brother, at defendant's request, telephoned his parents in California to explain the agreement and why their signatures were necessary thereon. Defendant's parents refused to sign the instrument and returned it to defendant. On June 18, 1951, defendant delivered the instrument unsigned by the parents back to plaintiff's attorney, specifying certain conditions on which he was making such delivery. These conditions concerned the repair of some of plaintiff's equipment and machinery in the plant. There is a direct conflict in the testimony as to whether plaintiff promised to make these repairs. The agreement itself provided that defendant would make all necessary repairs but the ownership of the equipment and machinery was to remain in plaintiff.

At the time the form of agreement was prepared on May 3, 1951, plaintiff gave defendant a check for $1,580, subject to two conditions contained in a letter of even date, the receipt of which was acknowledged by defendant over his signature. The letter referred to the

form of agreement and provided that the check was delivered on condition:

"1. That the contract between you and the Southern Canning Company of this date is to be signed by you and approved by your father and mother, Mr. and Mrs. Joseph Bommarito.

"2. That the check is in full and complete liquidation of all accounts or demands of every nature now existing between you and the Southern Canning Company."

Defendant cashed this check and received the proceeds thereof.

There is evidence tending to show that about June 14, 1951, defendant told plaintiff's attorney that he had obtained a lease from his parents for the premises where plaintiff's equipment was located. Plaintiff's attorney asked to see the lease but it was not shown to him until about August 18, 1951, or about two days before this action was commenced. Plaintiff's attorney was unable to state whether he had told his client about the existence of the lease before August 18, 1951. The president of plaintiff company testified he did not learn of its existence until after suit was filed.

Due to the controversy over the repairs and the failure to obtain the parents' signature of the agreement, plaintiff brought suit on August 20, 1951, to recover possession of its machinery.

The trial court found that the provision requiring the signature of defendant's parents was an essential part of the agreement, and said signatures not having been obtained, no contract in fact ever existed between the parties. It further found that at no time did plaintiff accept the lease in lieu of the parents' signatures to the contract.

■■ Defendant contends that the trial court erred in finding that no contract in fact existed between the parties by reason of the failure of defendant's parents to sign the agreement. Testimony of the negotiations leading up to the final agreement of May 3, 1951, was admitted into evidence by the trial court.

Defendant complains this violated the parol evidence rule and was reversible error.

Parol evidence of the negotiations prior to May 3, 1951, was admitted to show that the agreement never became operative as a contract because of a non-fulfillment of a condition therein. That parol evidence is admissible for this purpose is undeniably the law in Missouri. Pet Milk Co. v. Boland, 8 Cir., 1949, 175 F.2d 151; Barrett v. Davis, 104 Mo. 549, 16 S.W. 377; McElvain v. St. Louis & S. F. R. Co., 151 Mo.App. 126, 131 S.W. 736; Vardeman v. Bruns, Mo.App., 199 S.W. 710; Elmer v. Flett, Mo.App., 297 S.W. 985, 988. In Elmer v. Flett, supra, the court said, "The law is well settled that a writing in the form of a contract may be shown never to have become operative as a contract."

Again in Barrett v. Davis, supra [104 Mo. 549, 16 S.W. 379], the Supreme Court of Missouri said, "Facts going to show that a writing never acquired original vitality as a contract are not considered as infringing the rule of evidence excluding verbal contradiction of writings. Tracy v. [Union] Iron-Works Co., [104 Mo. 193], 16 S.W. 203". This court quoted the rule with approval in Pet Milk Co. v. Boland, supra. This testimony of prior negotiations was not admitted to vary, alter, or contradict the terms of the May 3, 1951, agreement, as defendant contends. The terms of the agreement were clear and unambiguous so that under the general rule the testimony would have been inadmissible. However, since the question before the court was whether there had been a meeting of the minds of the parties giving rise to an enforceable contract, evidence to show that the agreement never became operative was properly admitted.

■■ Plaintiff introduced evidence showing that defendant's father, recognized as the owner of the property where plaintiff's machinery was located, had previously refused to sign a contract to manufacture plaintiff's product and that the relations between these parties had

become very strained when defendant took over Cardinal Products Co. That defendant's father was displeased at the changes made and damage done to his building when plaintiff moved its equipment in. That Mr. Zidell, who represented plaintiff during the negotiations, insisted that consent be obtained from defendant's parents to use the premises. That the delivery of the check for $1,580 was expressly conditioned upon obtaining the parents' signatures. Defendant's testimony, which was directly controverted by plaintiff's witnesses, was to the effect that he told plaintiff's representatives during the negotiations that his father would never sign the agreement, but was told to try to obtain his parents' signatures and if they don't sign " * * * we'll have to find other ways of doing it." Defendant also testified on cross-examination that he sent the agreement to California to his parents and also called them in an effort to obtain their signatures. Upon this state of the evidence, the court could and did properly find that the provision requiring the parents' signatures was intended to be an essential part of the agreement and, absent their signatures, no contract ever existed. Defendant argues that if this provision was meant to be a condition of the contract, words such as "This agreement shall not be binding unless signed * * *", would have been inserted therein. While such words are appropriate and often used, they are not absolutely essential. Globe American Corp. v. Miller Hatcheries, Mo.App., 110 S.W.2d 393. We find no error in the trial court's finding that no contract existed between the parties.

■ Defendant argues that if the signatures of the parents was a condition of the contract, this condition was waived by performance under the contract. The evidence shows that defendant manufactured dog food for plaintiff from May until August, 1951, in accordance with the terms contained in the written agreement. Defendant contends that plaintiff cannot now claim the contract never became binding because of the absence of these signatures.

But the conditions under which the parties were operating clearly show that a waiver of the condition was not intended or effected. Plaintiff had moved its equipment into the plant under an oral agreement with defendant's father. Defendant's father manufactured dog food for plaintiff for several months but steadfastly refused to sign a written contract. When defendant took over his father's business, plaintiff renewed its efforts to get a written contract. Because it was mutually profitable, it was natural and reasonable that production should continue during this period. When it became apparent, however, that defendant's parents were not going to sign the agreement, plaintiff withdrew and sought to recover possession of its equipment. The trial court properly held, under the circumstances, that there was no waiver of the condition that the parents as owners of the real property should sign the agreement for its use.

■■ Defendant further argues that plaintiff waived the parents' signatures on the agreement by acceptance of the lease executed by them in lieu thereof. This argument we find to be without merit. Although plaintiff's attorney knew on June 14, 1951, that defendant had obtained a lease from his parents, it was not given to him for examination until shortly before this suit was filed. Defendant testified plaintiff's attorney told him, "Anytime you get down here by the office we will take a look at it." Plaintiff's attorney testified that he told defendant's attorney, when asked if the lease would be a satisfactory substitute for the parents' consent to the agreement, "I can't speak for my people, but let me see the lease." It is difficult to see how this constituted a waiver. The president of plaintiff did not learn of the existence of the lease until long after suit was filed. There was no attempt to show plaintiff's attorney had authority to waive the condition. Authority to waive a substantial right of the client cannot be implied

from the mere relationship of attorney and client. Sainsbury v. Penn Greyhound Lines, 4 Cir., 183 F.2d 548, 21 A. L.R.2d 266; 5 Am.Jur. Attorney at Law, Section 70.

Appellant contends that the court committed error in admitting into evidence a letter written by plaintiff's attorney and certain testimony by plaintiff's witness, Smith. This letter was, in effect, a resumé of the actions of both parties prior to and after the agreement of May 3, 1951. Defendant's objection that the letter was self-serving was overruled, the court saying, "I think that is probably true, Mr. Bartlett, if it was a matter before the jury, I would probably so rule, but this is before the court." Smith was allowed to testify, over objection, that he would not have signed the agreement if he had not believed defendant's parents would give their approval. In answering the objection of incompetency, the court stated, "We will leave it in for what it may be worth. I realize a good part of it is not evidence."

Although we do not encourage the admission of this type of evidence, in *Thompson v. Carley*, 8 Cir., 140 F.2d 656, 660, we stated the rule to be: "In a nonjury case, the presumption is that the trial court considered only the competent evidence and disregarded all evidence which was incompetent. [Cases cited]." In Thompson v. Baltimore & O. R. Co. 8 Cir., 1946, 155 F.2d 767, this court held that the admission of incompetent evidence on a trial to the court without jury does not render the findings erroneous where there is substantial competent evidence to support them. All matters alluded to in the letter were testified to directly by plaintiff's witnesses. The evidence contained in the letter was of a cumulative, rather than of a corroborative nature. Aside from the letter there is substantial competent evidence in the record on which the court could base its findings. The same is true of the conclusion testified to by the witness Smith. The substantial competent evidence in the record justified the court in finding that the provision respecting the parents' consent to the use of their property was intended to be a condition of the contract. We are convinced the court's finding would not have been otherwise had the letter and testimony complained of been excluded.

Finding no error, the judgment of the lower court is affirmed.