# JOHN DONOVAN v. WELLS, FARGO & COMPANY, Appellant.

### In Banc, June 1, 1915.

1. INTERSTATE COMMERCE: Congressional Legislation: State Laws and Decisions Thereby Superseded. The Carmack Amendment to the Hepburn Act (Sec. 20, Act June 29, 1906, c. 3591, 34 U. S. Stat. at L. 584, 593) so completely covered every detail of interstate commerce that it cannot be doubted that Congress intended to take possession of the whole subject, including the liability of a common carrier under a bill of lading, and to supersede all State regulation in reference to it; and thereby the. former adjudications of this court and other State courts pertaining to the liability of a carrier under an interstate shipment contract, not in harmony with such amendment and the subsequent decisions of the Supreme Court of the United States, were likewise superseded.

2. ———: Negligence: Limited By Agreed Tariff. Following the decisions of the Supreme Court of the United States, it is *held* that an interstate carrier cannot exempt himself from liability for his own negligence or that of his servants; but he may by a just, fair, open and reasonable agreement limit the amount recoverable by the shipper in case of loss or damage, even though due wholly to the carrier's negligence, to an agreed value placed upon the thing shipped for the purpose of obtaining the lower of two or more tariff rates proportioned to the amount of the risk.

3. ———: Rate: Unreasonable Contract. If the charges for an interstate shipment of live stock, filed as the tariff rates with the Interstate Commerce Commission and properly posted, are unreasonable or unjust the attack upon them on that account must be made before the Commission; while in force, they are equally binding on carrier and shipper; if the published rates provide for alternate rates based on value, and the shipper names a value based on the lower rate, the carrier in the absence of rebating or false rating is entitled to collect the rate which applies to the valuation, and if sued for damages is liable only for what the shipper had declared the value to be, and the shipper cannot claim a higher amount on the ground that the rate for a larger valuation was so excessive as to be unreasonable and unjust and was devised by the carrier for the purpose of forcing the shipper to surrender by contract his right to claim actual damages.

4. ———: Agent's Written Contract: Oral Agreement With Owner: Published Rates. The shipper and carrier must both take notice of the tariff rates published in accordance with the Interstate Commerce Act, and have a right to make a contract calling for a tariff rate based upon the value of the property transported; and where an oral agreement for an interstate shipment is made by the carrier and owner, the terms of which are forbidden by that law, and a published interstate rate is filed containing regulations prescribing conditions precedent for the acceptance of goods for carriage, he who delivers such goods for shipment at the owner's request must be held to be authorized by the owner to enter into and execute the written contract of shipment in harmony with the legal regulations, and if he places a value upon the thing shipped which calls for the lowest tariff rate, the owner is bound thereby, and cannot in case of loss or injury recover as damages a greater sum than such value.

5. ———: Carrier's Knowledge of Actual Value. In the absence of collusion between the carrier and shipper, actual knowledge by the carrier that the real value of the horse largely exceeded that declared does not make the limited-liability contract a violation of the Interstate Commerce Act, and the carrier is not thereby made liable to pay the actual value of the horse in case of total loss.

Appeal from Buchanan Circuit Court.—*Hon. W. K. Amick*, Judge.

REVERSED AND REMANDED.

*Lathrop, Morrow, Fox & Moore* and *Culver & Phillip* for appellant.

(1) The shipment in question was interstate. It was therefore controlled by the Interstate Commerce Act and its amendments. Under section 20 of the Carmack Amendment to said act, as construed by the Supreme Court of the United States, the plaintiff in this case could not recover more than the declared value on which the shipping rate was based as snown by defendant's filed and published tariffs and as provided in the shipping contract. The court erred in permitting the recovery of the full value notwithstanding

these tariffs and said contract.  Express Co. v. Croninger, 226 U. S. 491; Railroad v. Miller, 226 U. S. 513; Railroad v. Latta, 226 U. S. 519; Kansas City Southern Ry. Co. v. Carl, 227 U. S. 639; M. K. & T. Ry. Co. v. Harriman, 227 U. S. 657.  (2)  It is no defense to the shipper to say that he was not familiar with the tariffs or that his shipping agent violated his instructions.  It is presumed that the shipper has taken notice of the duly filed tariff; and such tariff and a contract made pursuant to its terms are binding and conclusive on both shipper and carrier.  Kansas City Southern Ry. Co. v. Carl, 227 U. S. 639; Great Northern Ry. Co. v. O'Connor, 232 U. S. 508.

*John E. Dolman* for respondents.

We agree with the defendant that there is only one point in this case, and that it is to be determined by the construction of the Interstate Commerce Act.  We assume for the purpose of presenting it that where there are two rates based upon value, the value fairly declared by the shipper as the true value determines the legal rate which the carrier must exact and the shipper pay, and which the court must accept in determining the rights and liabilities of the parties; and that the rule of law which has always obtained in this State and most other common law jurisdictions that a carrier will not be permitted to contract against liability for the negligent performance of his public duties has been modified (if it be a modification) to that extent by the Interstate Commerce Act, but we insist that the rule thus established has no application in this case, because there was no such declaration or agreement.  Boston & Maine Ry. Co. v. Hooker, 233 U. S. 97.

FARIS, J.—This is an action brought in the circuit court of Buchanan county for the negligent kill-

ing of a horse of plaintiff by defendant, while defendant was engaged as a carrier in transporting said horse from Boston, Massachusetts, to St. Joseph, Missouri.

As a foreword we may say that respondent, pending this appeal here, died and this cause has been properly revived in the names of John D. Richardson and J. G. Schneider as administrators of the estate of respondent, deceased. With this fact kept in mind we see no valid reason for disturbing the style of· this case and will refer to the substituted respondents as plaintiff, and to appellant herein simply as defendant.

The facts which are necessary to an understanding of the points discussed, are as follows:

Colonel John Donovan, originally plaintiff, now, as stated, deceased, sometime in the latter part of May, 1907, procured one Louis Pfingst, a resident of Boston, Massachusetts, and a friend of plaintiff, to purchase for him a valuable horse named "Flexo," being the same which was killed by defendant's negligence. The price paid for the horse Flexo by plaintiff was the sum of $2600. Plaintiff being desirous of having this horse shipped by express from Readville, Massachusetts, a suburb of Boston, to St. Joseph, Missouri, procured the delivery of the horse by said Pfingst at the office of defendant in Boston. A day or so prior to such delivery one Nichols, the agent of defendant at St. Joseph, called on plaintiff with a view of procuring for defendant the transporting of the horse. Relating what occurred in his conversation with Nichols, plaintiff testified as follows:

"I told Mr. Nichols that I had a horse and a mare at Boston, and I asked him what it would cost me to deliver them at St. Joseph. He told me $135 each. I asked him if it was the same price for each horse, without regard to value. He said, 'Yes.' I asked him if a horse that I bought for twenty-six hundred dollars, and was worth that many thousand, ought not to be charged any more than a mare that cost two hundred

and seventy dollars, and was worth about three hundred and fifty dollars. He said a horse was a horse, and all carried at the same rate, and he quoted a case where I had shipped a big Percheron stallion to Portland, Oregon, that weighed twenty-three hundred pounds, and he was carried at a rate of a thousand pounds. He said all horses were alike. I thought that that was a pretty big price for the shipment, and I wrote to W. T. Van Brunt, who was a director in the Wells Fargo Company in New York. I had had · some previous shipments with them, and I asked him if that was — . . . I asked if, on account of the value of the horse, I should require a special car. I asked Mr. Nichols, if, on account of the value of the horse, I should not have a special car, and a man in charge, and he told me no, that they would be shipped in portable stalls, in the regular express car, where a man who understood it would care for them, and where there was always at least one messenger right in the car with them, day and night, and that I would get them in three days from the time they left there. That was my contract with Mr. Nichols, and he said he would arrange the shipment in Boston, which he did, as far as I know. I asked Mr. Nichols if there was any chance of him being mistaken about the value of the horse, and told him that by shipping by freight a stallion was always charged three or four times as much as a gelding or a mare, and he said that the absence of that in express shipments, and the difference in time, was what made the price; and I told him to go ahead and do it, and he said he would instruct Boston, and that I would have no further trouble about it."

· Shortly after the above conversation plaintiff became ill, though he had in the meantime and prior to his illness, apparently, sent the following telegram to said Pfingst, which, date, address and signature omitted, is, to-wit:

"Please send both horses quick by Wells Fargo Express without man in charge. Express people will feed and care for them. I leave it to you about Flexo harness and traps. I naturally want all necessary to work him; do not know how much that requires, as have never seen him rigged for work. Wire me when they leave."

The above telegram was shown by Pfingst to defendant's agent at Boston, who thereupon wired Nichols at St. Joseph as follows:

"A man whose responsibility is unknown to me shows despatch from John Donovan, St. Joseph, ordering two horses forwarded by Wells Fargo to St. Joseph, asks us to furnish whole car. Please interview consignee, telegraph us suitable instructions. Horses now at Readville, exclusive office Adams Express, ten miles from Boston, therefore shipment must be brought to Boston if Wells Fargo is to handle."

In answer to the telegram last above Nichols wired the below message to agent of defendant at Boston:

"Secure Donovan horses. Have them driven to Boston and forward by our line. Don't want whole car, but do want safe handling in portable stalls. Wire departure. Have quoted him three rates on one thousand pounds each. No special valuation."

Prior to sending the above telegram Nichols had called on plaintiff for further instructions, but plaintiff being ill was unable to see him, though the nature of Nichols's business, which was to obtain certain and definite information as to the manner in which plaintiff desired to have the horse shipped, was communicated to plaintiff by the latter's daughter. Plaintiff thereupon wrote a note to defendant's agent, Nichols, as follows:

"Don't want exclusive car. Don't want man in charge. Do want horse [sic] brought to Boston and shipped by W. F. Ex. at price named by you, $135 each."

Donovan v. Wells, Fargo & Co.

Following these instructions Pfingst on May 29, 1907, delivered the horse Flexo to defendant, together with a little mare not here in controversy, upon an express car at Boston, and on delivering these horses executed what is called in the record a "limited liability live stock contract." The form of these contracts is so well known that we do not deem it necessary to take up space with the whole of this one and content us therefore with setting out only such parts as are necessary to make clear the discussion. The contract in question began with a "Notice to shippers," which notice continuing, provided that "the shipper will value his stock, which valuation will be inserted in the contract, and the charge for carriage will be based on such valuation." Other clauses pertinent ran thus:

This contract made at Boston, Mass., this 29 day of May, 1907, between Wells Fargo & Company, party of the first part, hereinafter called the Express Company, and L. Pfingst, hereinafter called the shipper, party of the second part.

Witnesseth: That the Express Company undertakes to forward to the railroad depot reached by the Express Company, which is nearest to destination, the animals hereinafter mentioned, of which the shipper declares himself to be the owner (or duly authorized agent of the owner), to-wit: One horse consigned to John Donovan at So. St. Joseph, Mo., *for the sum of one hundred thirty-five dollars and no cents, which charge is fixed by and based upon the value of said animals as declared by the shipper, as hereinafter mentioned.* [Italics ours.]

And in consideration of the premises, said parties agree: That the shipper, before delivering the said animals to said Express Company, demanded to be advised of the rates to be charged for the carriage of said animals as aforesaid, and thereupon was offered by said Express Company alternative rates proportioned to the value of said animals, such value to be fixed and declared by the shipper, and according to the following tariff of charges, viz.:

Charge for the shipment at these values:

For horses, jacks or mules of a value not exceeding $75. . . .

When the value declared by the shipper exceeds the value stated in the preceding paragraph, an addition to the forego-

Donovan v. Wells, Fargo & Co.

ing charge will be made according to the following schedule, to-wit: When the merchandise rate is . . . over $3 per 100 lbs. and not over $5 per 100 lbs., the additional charge will be 12 per cent of excess valuation.

The shipper in order to avail himself of said alternative rates, and in consideration thereof, being asked by the Express Company to value said property, now declares the value hereinafter mentioned to be the true values of said animals so to be shipped as follows: Number and kind, one horse; value, $50. . . .

WELLS FARGO & COMPANY,
by M'GOWAN, Agent.
Party of the first part.
LOUIS PFINGST,
(Duly authorized Agent of the Owner.)
Party of the second part.

The horse Flexo was in the course of transportation so badly injured by the negligence of defendant as to cause his death. This action thereupon followed and the trial below resulted in a verdict for plaintiff for the sum of $10,000, the same being the value of the horse as found by the jury.

Upon the trial, defendant, having duly pleaded all applicable provisions of the Interstate Commerce Act, offered among other things its duly filed and published tariff sheets, which were in force on the date of the making of this shipment, and which, together with regulations governing shipments, had theretofore been duly filed with the Interstate Commerce Commission as required by law.

In brief, these tariff sheets showed that the merchandise rate from Boston to St. Joseph was $4.50 per hundred pounds; that the rate on horses was three times the said merchandise rate, based upon the arbitrary estimated weight of one thousand pounds for each horse, regardless of the actual weight thereof; thus making the charge for the carriage of a horse of a declared value not to exceed $75, the sum of $135, as set out in the live stock contract above. This tariff sheet further says that "when the value declared by the shipper exceeds that given above, an additional

charge must be made on the excess valuation" of 12%
of such excess valuation.

There is in the case as presented to us on this
appeal, no contention as to the fact that defendant's
negligence caused the death of the horse; nor is any
question raised as to the correctness of the jury's ver-
dict as to the value of said horse. The sole question
is whether under the facts here plaintiff is entitled to
recover the sum of $10,000, conceded, for the purposes
of this appeal, to have been the value of the horse in
question, or whether he is limited to the sum of $50,
the declared value as set forth in the live stock con-
tract executed by said Pfingst. Such further facts as
may be necessary to make clear what we say, will be
found in the opinion.


## OPINION.


Much testimony was taken and many instructions
given upon the trial, but in the last analysis whether
we shall affirm or whether we shall reverse and re-
mand this case, turns upon the answer to this single
question, viz.: May an interstate shipper in case of
loss, recover more than the declared value of an article,
where there are two rates based upon value, and where,
though the true value is made known, a lower rate is
taken upon such arbitrary declared value fixed by the
shipper for the purpose of securing the lower rate?
The question as put comprehends the compliance by
the carrier with all of the provisions of the Interstate
Commerce Act, as to filing and publishing its tariff
sheets which were in force on the 29th day of May,
1907, the fact as to which in this case is not seriously
denied.

I. Since this is conceded to be an interstate ship-
ment, and since it involves the legal effect of the Car-

**Interstate Commerce:**
**Now Regulated**
**By U. S. Statute.**

mack Amendment to the Hepburn Act (34 U. S. Stat. at L. 584, chap. 3591), we need in nowise concern ourselves with the condition upon the case stated of our own statute law or of the common law as inter- preted in this State. The curious may consult the cases of Rice v. Railroad, 63 Mo. 314; McFadden v. Railroad, 92 Mo. 343; Ward v. Railroad, 158 Mo. 226; Leas v. Railroad, 157 Mo. App. 455; Blankenship v. Railroad, 160 Mo. App. 631; Oxley v. Railroad, 65 Mo. 629; Paddock v. Railroad, 155 Mo. 524; McElvain v. Railroad, 151 Mo. App. 126; McElvain v. Railroad, 176 Mo. App. 379; Dawson v. Railroad, 79 Mo. 296; Kellerman v. Railroad, 136 Mo. 177; George v. Rail- road, 214 Mo. 551; Railroad v. Cleary, 77 Mo. 634; Richardson v. Railroad, 149 Mo. 311, for both the past and present condition of our own Missouri holdings, when unaffected by the Carmack Amendment to the Interstate Commerce Act. In the light of the recent rulings of the Supreme Court of the United States our decisions have been wholly superseded and become matters of ancient legal history or legal curiosity only. [Adams Express Co. v. Croninger, 226 U. S. 491; Atchison, Topeka & Santa Fe Ry. Co. v. Robinson, 233 U. S. 173; Missouri, Kansas & Texas Ry. Co. v. Harri- man, 227 U. S. 657; Great Northern Ry. Co. v. O'Con- nor, 232 U. S. 508; Kansas City Southern Ry. v. Carl, 227 U. S. 639; Wells, Fargo & Co. v. Neiman-Marcus Co., 227 U. S. 469; Boston & Maine Railroad v. Hooker, 233 U. S. 97.]

Clearly and concisely this legislative intent to occupy the entire field of interstate shipments and to wholly oust the several states from control thereof, is expressed by the Supreme Court of the United States in its construction of said Carmack Amendment in the case of A., T. & S. F. Ry. Co. v. Robinson, supra, wherein at page 180 it is said:

"It is thus seen that the defendant specially set up a defense under the Interstate Commerce Act, a Federal statute, which, if denied to him, was an adverse ruling of Federal right which would warrant the bringing of the case to this court from the highest court of a State under former section 709 of the Revised Statutes of the United States, now section 237 of the Judicial Code. It is apparent from the foregoing statement that the Federal question now presented involves the ruling of the State court denying to the carrier the benefit of the Interstate Commerce Act, a compliance with which was set up in the amended answer and supported by testimony tending to show the truth of the allegations thereof.

"That the effect of the Carmack Amendment to the Hepburn Act, sec. 20, Act of June 29, 1906, chap. 3591, 34 Stat. 584, 593, was to give the Federal jurisdiction control over interstate commerce and to make supreme the Federal legislation regulating liability for property transported by common carriers in interstate commerce has been so recently and repeatedly decided in this court as to require now little more than a reference to some of the cases. [Kansas City Southern Ry. Co. v. Carl, 227 U. S. 639; Missouri, Kansas & Texas Ry. Co. v. Harriman, 227 U. S. 657; Chicago, Rock Island & Pacific Ry. Co. v. Cramer, 232 U. S. 490; Great Northern Ry. Co. v. O'Connor, 232 U. S. 508.] We regard these cases as settling the proposition that the shipper as well as the carrier is bound to take notice of the filed tariff rates and that so long as they remain operative they are conclusive as to the rights of the parties, in the absence of facts or circumstances showing an attempt at rebating or false billing."

The applicable part of said Amendment to which reference is made in the excerpt supra, reads thus:

"That any common carrier, railroad or transportation company receiving property for transportation

from a point in one State to a point in another State shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered, or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad or transportation company from the liability hereby imposed: Provided, that nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.''

That upon first blush the cardinal dominating intent of this Amendment may appear to have been to devise means by which (1) a shipper, suffering loss or damage, could have at his door a convenient defendant as well as a handy forum; and (2) that it was designed to lessen the expense and difficulty, amounting often to impossibility, of making proof of the place and facts of the actionable injury or loss and of the identity of the actual tortfeasor, is now wholly beside the question. The Supreme Court, however, had already in an earlier case, Adams Express Co. v. Croninger, supra, at page 504 et seq., succinctly ruled upon this question, as well as upon that previously herein mentioned, as mark this language:

''First: It affirmatively requires the initial carrier to issue 'a receipt or bill of lading therefor,' when it receives 'property for transportation from a point in one State to a point in another.'

''Second: Such initial carrier is made 'liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it.'

''Third: It is also made liable for any loss, damage, or injury to such property caused by 'any common carrier, railroad or transportation company to

which such property may be delivered or over whose line or lines such property may pass.'

"Fourth: It affirmatively declares that 'no contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed.'

"Prior to that amendment the rule of carrier's liability, for an interstate shipment of property, as enforced in both Federal and State courts, was either that of the general common law as declared by this court and enforced in the Federal courts throughout the United States (Hart v. Pennsylvania Railroad, 112 U. S. 331); or that determined by the supposed public policy of a particular State (Pennsylvania Railroad v. Hughes, 191 U. S. 477); or that prescribed by statute law of a particular State (Railroad v. Solan, 169 U. S. 133).

"Neither uniformity of obligation nor of liability was possible until Congress should deal with the subject. The situation was well depicted by the Supreme Court of Georgia in Southern Pacific Co. v. Crenshaw, 5 Ga. App. 675, 687, where that court said:

" 'Some states allowed carriers to exempt themselves from all or a part of the common law liability, by rule, regulation or contract; others did not; the Federal courts sitting in the various states were following the local rule, a carrier being held liable in one court when under the same state of facts he would be exempt from liability in another; hence this branch of interstate commerce was being subjected to such a diversity of legislative and judicial holding that it was practically impossible for a shipper engaged in a business that extended beyond the confines of his own state, or for a carrier whose lines were extensive, to know without considerable investigation and trouble, and even then oftentimes with but little certainty, what would be the carrier's actual responsibility as to goods delivered to it for transportation from one state to

another. The Congressional action has made an end to this diversity; for the national law is paramount and supersedes all State laws as to the rights and liabilities and exemptions created by such transaction. This was doubtless the purpose of the law; and this purpose will be effectual, and not impaired or destroyed, by the State court's obeying and enforcing the provisions of the Federal statute where applicable to the fact in such cases as shall come before them.'

"That the legislation supersedes all the regulations and policies of a particular State upon the same subject results from its general character. It embraces the subject of the liability of the carrier under a bill of lading which he must issue and limits his power to exempt himself by rule, regulation or contract. Almost every detail of the subject is covered so completely that there can be no rational doubt but that Congress intended to take possession of the subject and supersede all State regulation with reference to it. Only the silence of Congress authorized the exercise of the police power of the State upon the subject of such contracts. But when Congress acted in such a way as to manifest a purpose to exercise its conceded authority, the regulating power of the State ceased to exist. [Northern Pacific Ry. v. State of Washington, 222 U. S. 370; Southern Railway v. Reid, 222 U. S. 424; Mondou v. Railroad, 223 U. S. 1.]''

Therefore, whether the effect of thus extending Federal control and authoritative Federal judicial construction over questions arising out of interstate shipments, to the entire preclusion of conclusive interpretation by the State courts, was adventitious or intentional, confessedly this effect has followed this amendment pursuant to a construction thereof neither harsh nor unduly violent and in this construction we acquiesce ungrudgingly, as in duty bound.

II.   We do not understand plaintiff to make the broad contention that a limited-liability live-stock contract, based upon the declared value as contradistinguished from the actual value of the animal shipped, is *ipso facto* void, for that it is of the nature of a contract against the negligence of the carrier.   If this broad contention be among the reasons urged, the point has long ago been settled against him.   [Hart v. Pennsylvania Railroad Co., 112 U. S. 331; Adams Express Co. v. Croninger, 226 U. S. 491.]

In the case of Adams Express Co. v. Croninger, supra, at pages 509 to 511, the Supreme Court said:

"That a common carrier cannot exempt himself from liability for his own negligence or that of his servants is elementary.   [York Mfg. Co. v. Illinois Central Railroad, 3 Wall. 107; Railroad Company v. Lockwood, 17 Wall. 357; Bank of Kentucky v. Adams Express Company, 93 U. S. 174; Hart v. Pennsylvania Railroad, 112 U. S. 331, 338.]   The rule of the common law did not limit his liability to loss and damage due to his own negligence, or that of his servants.   That rule went beyond this and he was liable for any loss or damage which resulted from human agency, or any cause not the act of God, or the public enemy.   But the rigor of this liability might be modified through any fair, reasonable and just agreement with the shipper which did not include exemption against the negligence of the carrier or his servants.   The inherent right to receive a compensation commensurate with the risk involved the right to protect himself from fraud and imposition by reasonable rules and regulations, and the right to agree upon a rate proportionate to the value of the property transported.

"It has therefore become an established rule of the common law as declared by this court in many cases that such a carrier may by a fair, open, just and reasonable agreement limit the amount recoverable by a

265Mo.20

shipper in case of loss or damage to an agreed value made for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk. [York Mfg. Co. v. Railroad, 3 Wall. 107; Railroad v. Lockwood, 17 Wall. 357; Hart v. Pennsylvania Railroad, cited above; Phoenix Ins. Co. v. Erie & W. Trans. Co., 117 U. S. 312, 322; Steam Co. v. Phenix Ins. Co., 129 U. S. 397, 442; New York, L. E. & W. Ry. v. Estill, 147 U. S. 619; Primrose v. W. U. Tel. Co., 154 U. S. 1, 15; Chicago, etc., Ry. v. Solan, 169 U. S. 133, 135; Calderon v. Atlas Steamship Company, 170 U. S. 272, 278; Pennsylvania Railroad v. Hughes, 191 U. S. 477, 485.]

"That such a carrier might fix his charges somewhat in proportion to the value of the property is quite as reasonable and just as a rate measured by the character of the shipment. The principle is that the charge should bear some reasonable relation to the responsibility, and that the care to be exercised should be in some degree measured by the bulk, weight, character and value of the property carried.

"Neither is it conformable to plain principles of justice that a shipper may understate the value of his property for the purpose of reducing the rate, and then recover a larger value in case of loss. Nor does a limitation based upon an agreed value for the purpose of adjusting the rate conflict with any sound principle of public policy. The reason for the legality of such agreements.is well stated in Hart v. Pennsylvania Railroad, cited above, where it is said (p. 340) :

" 'The limitation as to value has no tendency to exempt from liability for negligence. It does not induce want of care. It exacts from the carrier the measure of care due to the value agreed on. The carrier is bound to respond in that value for negligence. The compensation for carriage is based on that value. The shipper is estopped from saying that the value is greater. The articles have no greater value, for the

purposes of the contract of transportation, between the parties to that contract. The carrier must respond for negligence up to that value. It is just and reasonable that such a contract, fairly entered into, and where there is no deceit practiced on the shipper, should be upheld. There is no violation of public policy. On the contrary, it would be unjust and unreasonable, and would be repugnant to the soundest principles of fair dealing and of the freedom of contracting, and thus in conflict with public policy, if a shipper should be allowed to reap the benefit of the contract if there is no loss, and to repudiate it in case of loss.' "

Regard being had to the duty under which we labor of conforming in all things to the views held by the Supreme Court, we hold that a limited-liability contract for the valuation and shipment of live stock is not void if "the carrier by a fair, open, just and reasonable agreement limit the amount recoverable by a shipper in case of loss or damage to an agreed value for the purpose of obtaining the lower of two or more rates of charges proportioned to the amount of the risk." [Boston & Maine Railroad Co. v. Hooker, 233 U. S. 97.] Neither does this view differ very largely, if at all in principle, from the rule long held in this State. [Paddock v. Railroad, 155 Mo. 1. c. 544; George v. Railroad, 214 Mo. 551.]

III. Coming now to the several bones of contention; and in order to be exact as well as fair, we state the precise position of counsel for plaintiff in his own language. Stating his attitude (a little bit negatively, it may be), he says:

"We will assume for the purpose of presenting it that where there are two rates based upon value, the value fairly declared by the shipper as the true value determines the legal rate which the carrier must exact

**Unjust Contract: Excessive Rates for Increased Valuation.** and the shipper pay, and which the court must accept in determing the rights and liabilities of the parties; and that the rule of law which has always obtained in this State and most other common-law jurisdictions that a carrier will not be permitted to contract against liability for the negligent performance of his public duties has been modified (if it be a modification) to that extent by the Interstate Commerce Act, but we insist that the rule thus established has no application in this case, *because there was no such declaration or agreement."* (Italics ours).

Elaborating his position as we gleam it from other parts of his argument, plaintiff urges that since he informed Nichols, the general agent of defendant, of the true purchase price of the horse killed, viz., $2600 (as well as the *pretium affectionis,* viz., $26,000), it then and there became the duty of defendant under the provisions of the Interstate Commerce Act to charge and collect the true and correct tariff rate upon this value (Query, the purchase price value, or the *pretium affectionis* value?—a large part of which latter at least was recovered below) and that the neglect and failure of the defendant's agent to charge this sum (again the query arises, *which sum?*), was in effect a fraud and evasion of the provisions of the letter and spirit of the Interstate Commerce Act, and a creation of a preferential rate, or rebate, and that thus and thereby the transaction so far ceased to be "fair, open, just and reasonable," as to render the carrier liable to pay the true value of the horse killed.

Let us see if this is true. In determining the applicable law we may concede two facts that are either not denied, or which follow as true in law from well-known and settled fundamental principles, (a) that plaintiff at St. Joseph and plaintiff's agent Pfingst at Boston informed defendant of the value of the horse in question; the former valuing him at from $2600 to $26,000, and

the latter at $2,000, and (b) that in both the St. Joseph office and the Boston office of defendant, its filed and printed tariff sheets and regulations were published in compliance with the Interstate Commerce Act. [Sec. 6, Int. Com. Act, 34 U. S. Stat. at Large, 584; Texas & Pacific Railway Co. v. Cisco Oil Mill, 204 U. S. 449.] Both plaintiff and Pfingst testify to the matter of the oral declaration of value, thus making of it a question solely for the jury, and which we may not resolve. The employees of defendant at both the said offices testify as to the publication of the rates, and no one denies the fact categorically, though plaintiff swears he saw no such tariffs, but frankly admits that he did not ask to see them. So, we need not take time or space to examine carefully, or to decide, whether such publication be a condition precedent to the enforceability of a filed rate under the Interstate Commerce Act. Besides, this is a question for the Federal courts and the curious may examine the cases of Texas & Pacific Railway Co. v. Cisco Oil Mill, supra; Great Northern Ry. v. O'Connor, 232 U. S. 508; Atchison, Topeka & Sante Fe Ry. Co. v. Robinson, 233 U. S. 173, and Boston & Maine Railroad v. Hooker, 233 U. S. 97.

In passing we note that learned counsel for plaintiff complains with some bitterness and sarcasm that if plaintiff had declared the value of the horse killed as the jury found it, then pursuant to the rates set forth in defendant's filed tariff sheets, plaintiff would have been compelled to pay $1326 for the carriage of this horse from Boston to St. Joseph, and counsel suggest that the horse could have been driven from Boston to St. Joseph "on the hoof" much more cheaply. From this fact plaintiff argues "that instead of this twelve per cent rate being imposed in good faith for the production of revenue, it was devised solely for the purpose of forcing the public to surrender by contract the remedies which the law provided against carriers for the negligent performance of their public

duties." Whether this be a fact, or arise as an obvious deduction from the facts, we need not inquire, as we regard it as settled against plaintiff's contention by what is held by the Supreme Court in the case of Boston & Maine Railroad v. Hooker, supra, wherein at page 121 it was said:

"If the charges filed were unreasonable, the only attack that could be made upon such regulation would be by proceedings contesting their reasonableness before the Interstate Commerce Commission. While they were in force they were equally binding upon the railroad company and all passengers whose baggage was transported by carriers in interstate commerce. This being the fact, we think the limitation of liability to $100 fixed the amount which the plaintiff could recover in this case, and there was error in affirming the recovery for the full value of the baggage, in the absence of a declaration of such value and payment of the additional amount required to secure liability in the greater sum."

Plaintiff could therefore if the rate fixed was excessive (and herein lay his recourse in such contingency), have paid the full sum demanded, and then have recovered back any unreasonable excess charge by a reparation order. [Great Northern Ry. v. O'Connor, 232 U. S. 1. c. 515.] In the case last above cited, at page 515, it was said:

"The shipper had the right, by appropriate proceedings, to attack the rate or the classification and if either or both were held to be unreasonable could secure appropriate relief either by Reparation Order, or by suit in court, after such finding of unreasonableness. But so long as the tariff rate, based on value, remained operative, it was binding upon the shipper and carrier alike and was to be enforced by the courts in fixing the rights and liabilities of the parties. The tariffs are filed with the Commission and are open to inspection at every station. In view of the multitude

of transactions, it is not necessary that there shall be an inquiry as to each article or a distinct agreement as to the value of each shipment. If no value is stated the tariff rate applicable to such a state of facts applies. If, on the other hand, there are alternative rates based on value and the shipper names a value to secure the lower rate, the carrier, in the absence of something to show rebating or false billing, is entitled to collect the rate which applies to goods of that class, and if sued for their loss it is liable only for the loss of what the shipper had declared them to be in class and value."

Going back as a basis for what we shall next say, to the evidence upon which we base the first of the above conceded facts, we think it fairly manifest that the minds of Nichols, the agent at St. Joseph of defendant, and that of plaintiff never met in truth, upon the matter of value. It is plain that the plaintiff had in mind the value of the horse as a basis of rate of carriage; while Nichols, it is fairly obvious, referred to weight and to the fact that "a horse is a horse" without regard to whether such horse weighed 2300 pounds (as did a Percheron horse shipped formerly by plaintiff), or only 900 pounds, as did the little mare shipped here with the horse in controversy, and that any horse whether large or small, was arbitrarily held to weigh but 1000 pounds. We say so much here, and bear with us this thought, for use when we shall come to consider whether there was present in the mind of either plaintiff or defendant's agent a conscious intent to undervalue, and to connive at undervaluation, in order to fraudulently evade the published tariff rates, and thus give a preferential rate or rebate to plaintiff, and thereby to take an unlawful advantage of competitive carriers.

IV. It is urgently insisted that Pfingst under the facts upon this record, had no authority to bind plain-

tiff. We do not think that upon these facts, even at common law, this position of plaintiff is tenable. Certainly defendant is not bound by the

Agent of Shipper: Oral and Written Contract.

private instructions, if any, given to Pfingst by the plaintiff. [Great Northern Ry. v. O'Connor, 232 U. S. 1. c. 514; Int. Com. Comm. v. Railroad, 220 U. S. 235; McElvain v. Railroad, 151 Mo. App. 126.] The instructions which are shown upon the record do not negative the existence of an agency broad enough to bind plaintiff at common law. But be this as may be, the construction which has been placed upon the Interstate Commerce Acts and the reciprocal notice and duties arising and comported thereby and which affect both shipper and carrier, make Pfingst the agent with power under this law to bind and loose plaintiff as to the shipment of this horse. This is so because pursuant to the provisions of the Interstate Commerce Act [Sec. 15, Act June 29, 1906, 34 Stat. 584], the carrier is permitted to make and file reasonable regulations touching the manner in which shipments are permitted to be made. These regulations, when fair and reasonable, and when filed and in force, because of such fairness and reasonableness, or because no ruling has been made upon such fairness and reasonableness (Boston & Maine Railroad v. Hooker, supra,) are enforceable. Here defendant had made and filed with its tariffs and as a workable part thereof this regulation, viz.:

Live Stock:
Any charge for valuation will be assessed according to Rule 10 (i), page 4.
Receive only upon the execution of the company's live stock contract, except that live stock contracts need not be taken for shipment of calves and sheep for market, which may be accepted on the ordinary freight receipt, subject to owner's risk of injury, death or escape.
Live Stock—In carloads, estimate at 10,000 lbs., subject to rules provided above.

Horses—Estimate single animal at 1,000 lbs., minimum $25 (See Rule 12); the minimum applies to each horse in the shipment, but the total charge must not exceed the carload rate ........................................................3 t Mdse.

If defendant had the right to make different rates based upon the value of the horse transported, and some higher than others in proportion to the risk—and as to this, in the light of the authorities, there can be no two diverse views—then indubitably it had the right to prescribe such regulations as were necessary to enforce these different rates and make them uniformly effective. It is fairly obvious that absent a contract in writing it would be next to impossible to carry out the provisions as to a tariff rate based upon the value of the property transported. Since defendant had filed and published its tariffs together with the requirement quoted above herein as to the execution of the company's live stock contract as a condition precedent to the acceptance of live stock for shipment, notice of the fact that before Pfingst could ship the horses from Boston he would be required to execute a contract in accordance with the filed tariffs, must be imputed to plaintiff. [Boston & Maine Railroad v. Hooker, supra.] In the case last above cited, there was a regulation contained in the filed and published passenger tariff sheets that in the absence of a declaration of value in excess of $100 for baggage carried upon a passenger's ticket and the payment by the passenger on the excess of such value at the rate of fifteen cents for each one hundred dollars thereof, no greater sum than $100 for the loss of any such baggage could be recovered. In stating the position of the defendant in that case the court sets it forth thus boldly:

"The precise position of the defendant is that as the limitation of liability for baggage was filed and posted as a part of its schedules for passenger tariff, the limitation thereby became and was an essential part of its rate, from which under the interstate com-

merce law it could not deviate, and by which the plaintiff was bound, regardless of her knowledge of or assent to it. If the premise is sound, then the conclusion follows, for the public are held inexorably to the rate published, regardless of knowledge, assent or even misrepresentation. [Gulf, Colorado & Santa Fe Railway v. Hefley, 158 U. S. 98; Texas & Pacific Railway v. Mugg, 202 U. S. 242; Melody v. Great Northern Railway, 25 S. D. 606.]''

Held, nevertheless, that the limitation of recovery at the sum of $100 only was valid and ought to be, and the same was upheld.

Much in point also is the case of Atchison, etc., Ry. Co. v. Robinson, 233 U. S. 1. c. 180, where, in an action like this based upon an oral contract, but defended upon a written live stock contract, it was said:

''To give to the oral agreement upon which the suit was brought, the prevailing effect allowed in this case by the charge in the trial court, affirmed by the judgment of the Supreme Court of the State, would be to allow a special contract to have binding force and effect though made in violation of the filed schedules which were to be equally observed by the shipper and carrier. If oral agreements of this character can be sustained then the door is open to all manner of special contracts, departing from the schedules and rates filed with the Commission. [Kansas City Southern Ry. Co. v. Carl, 227 U. S. 1. c. 652.] To maintain the supremacy of such oral agreements would defeat the primary purposes of the Interstate Commerce Act, so often affirmed in the decisions of this court, which are to require equal treatment of all shippers and the charging of but one rate to all, and that the one filed as required by the act.''

Indeed, so far as the record of the facts before us discloses there is not the faintest suggestion in plaintiff's instructions to his friend and agent Pfingst, that the plaintiff did not expect said Pfingst to comply

with the regulations contained in the published tariff sheets of defendant, and to execute such requisite documents as defendant's filed and published regulations and tariff sheets reasonably provided for. For "so long as the tariff rate based on value, remained operative it was binding upon the shipper and carrier alike." [Great Northern Ry. Co. v. O'Connor, 232 U. S. 508.]

In fact, plaintiff under the provisions of the Interstate Commerce Act could not have legally made with Nichols, the defendant's agent, an oral contract for the carriage of the horse upon the basis of value he says he declared to Nichols, for the sum of $135, which he says he contracted to pay to defendant. This is so for the reason that defendant by its published tariff sheets filed with the Interstate Commerce Commission, held  out to all shippers that its rate for the carriage of a horse by express from Boston to St. Joseph was $135 plus 12 per cent additional for all excess in value of such horse above $75. If it gave to plaintiff a lower rate, without requiring plaintiff to obtain such lower rate in the same manner all others of the shipping public obtained it, to-wit, by executing a limited liability live stock contract, it manifestly gave plaintiff thereby a forbidden preferential rate or rebate. Apposite to this very point, as well as upon another one here of vital importance, it was said in the case of Kansas City Southern Ry. Co. v. Carl, 227 U. S. l. c. 652:

"The valuation declared or agreed upon as evidenced by the contract of shipment upon which the published tariff rate is applied, must be conclusive in an action to recover for loss or damage a greater sum. In saying this we lay on one side, as not here involved, every question which might arise when it is shown that the carrier intentionally connived with the shipper to give him an illegal rate, thereby causing a discrimination or preference forbidden by the positive terms of the act of Congress and made punishable as

a crime.   To permit such a declared valuation to be overthrown by evidence *aliunde* the contract, for the purpose of enabling the shipper to obtain a recovery in a suit for loss or damage in excess of the maximum valuation thus fixed, would both encourage and reward undervaluations and bring about preferences and discriminations forbidden by the law.   Such a result would neither be just nor conducive to sound morals or wise policies.   The valuation the shipper declares determines the legal rate where there are two rates based upon valuation.   He must take notice of the rate applicable, and actual want of knowledge is no excuse.   The rate, when made out and filed, is notice, and its effect is not lost, although it is not actually posted in the station.   [Texas & Pacific Railway v. Mugg, 202 U. S. 242; Chicago & A. Railway v. Kirby, 225 U. S. 155.]''

So, we think it fairly follows that where in an interstate shipment an oral contract is made, the terms of which are forbidden by a law which the shipper and the carrier must both notice, and where a published interstate rate is filed containing regulations prescribing conditions precedent to the acceptance of goods for carriage, he who delivers such goods at the owner's request for shipment, must be held to be authorized by the owner to comply with the law and with all reasonable published regulations as to the terms and conditions of shipment, and that the shipper will not be heard to assert the contrary.

The case of Great Northern Ry. v. O'Connor, 232 U. S. 508, presents a question which is similar to that here involved touching whether Pfingst had authority to bind plaintiff by his execution of the live stock contract under consideration.   It was held nevertheless (syllabus), following the earlier case of Int. Com. Comm. v. Delaware, L. & W. Railroad Co., 220 U. S. 235, ''that carriers are not concerned with questions of title, but must treat the forwarder as shipper and

charge the applicable rates," and that this rule "applies also to accepting the forwarder's classification and valuation, without regard to any private instructions given by the actual shipper to the forwarder." So, we rule this point against the plaintiff.

V. Which brings us to the question of whether, since the agent of defendant at St. Joseph and its agent at Boston both knew from information obtained respectively from plaintiff and from Pfingst that the horse's value largely exceeded that declared in the live stock contract, such knowledge of itself made the limited-liability contract a violation of the Interstate Commerce Act, and thereby made it liable to pay any actual value of the horse which the proof might allow. We do not think this result follows in the absence of collusion between plaintiff and defendant's agents to declare a false value for the purpose of securing a quasi-rebate or preferential rate. We are not passing upon the question whether even in the presence of such collusion between defendant and plaintiff, a recovery could be had, or whether an unlawful conspiracy to defeat the rates published would not as to all participants so far tinge the entire transaction with fraud as to prevent a recovery of the true value; in short, would leave both plaintiff and defendant where it found them. The latter point cannot be gotten into this case upon the pleadings or points raised; so we will leave it till a case comes up with such collusion well lodged therein.

It seems so obvious as to be self-evident, that the mere fact that defendant's agents knew at the time the rate was made that the actual value of the horse was in excess of the declared value could not so far overthrow the fairness, openness, justness and reasonableness of the contract limiting liability to such declared value as to render such contract void. In fact, the frank knowledge, ordinarily, of the existence of two

*Knowledge of Actual Value.*

rates and of a real and a fictional (i. e., the actual and the declared) value of the goods offered for shipment must be mutually known by the shipper and the carrier, so that the privilege of taking the lower or the higher rate may be freely offered to the shipper in the fair and open light of all of the facts. Any other view would have the effect to destroy instantly the entire scheme of a limited-liability shipping contract, and none such could longer exist under the provisions of the Interstate Commerce Act. On the contrary there does not exist, in our view, any valid reason based upon any provision or construction of the Interstate Commerce Act why the shipper and the carrier may not for their mutual advantage contract to share a contingent loss, in consideration of a present lower rate; *a fortiori* since the like course and the like rate is open to any and all shippers, so that such a rate can therefore in no view constitute a preferential rate or a rebate. [Pierce Co. v. Wells, Fargo & Co., infra.] Indeed, this identical certain knowledge on the part of the carrier's agent of the actual value of the article shipped was present in the very late case of George N. Pierce Co. v. Wells Fargo & Co., 236 U. S. 278. There the shipment consisted of a car load of automobiles. These were released by a limited-liability contract at a valuation of $50 each. The matter of valuation was discussed at length by the shipper with the agent of defendant and the low valuation was explained upon the theory, erroneous as it subsequently proved, that the automobiles were insured. That case, the very last utterance of the Supreme Court upon this point, is upon the fact as to certain information in the defendant of the actual value of the goods, a far stronger case than the instant one. Yet no emphasis was laid upon the fact of such knowledge, as varying the rights or obligations of the parties in any wise, but on the contrary the court, apposite to this very question, said:

"In the O'Connor case, 232 U. S. 508, and the Robinson case, 233 U. S. 173, above cited, the doctrine of the conclusiveness of the filed rates was said to have no application to attempted fraudulent acts or false billing. We do not perceive how this doctrine can be applicable to the present case. As the state of facts shows, the transaction was open and above board, the character of the goods was plainly disclosed and known to both parties, and the rate paid was not attempted to be fixed upon actual value alone, but upon a value which the shipper was competent to agree to, in consideration of the lower rate. Indeed, if a recovery for full value was to be permitted in this case, the shipper itself would obtain an undue advantage in recovering such value, when it had purposely and intentionally taken the risk of less responsibility from the carrier, for a lower rate. Such result would bring about the the very favoritism which it is the purpose of the Commerce Act to avoid."

But we need not pursue this matter further at the expense of space. Whatever of authority may be lacking for the views held herein will be found in the several late cases which we cite. Those interested may read them there.

It follows that the amount which plaintiff may recover is limited by the declaration of value made in the shipping contract, and therefore that the judgment herein should be reversed and remanded to be retried in accordance with the views expressed herein. All concur, except *Woodson, C. J.,* and *Blair, J.,* not sitting.